**FILED**
United States Court of Appeals
Tenth Circuit

**July 24, 2018**

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

NAVAJO NATION; NORTHERN
EDGE NAVAJO CASINO,

     Plaintiffs - Appellants,

v.

The Honorable BRADFORD J.
DALLEY, District Judge, Eleventh
Judicial District, New Mexico, in his
official capacity; HAROLD
MCNEAL; MICHELLE MCNEAL,

     Defendants - Appellees,

_____

NEW MEXICO TRIAL LAWYERS
ASSOCIATION; PUEBLO OF
SANTA ANA,

     Amici Curiae.

No. 16-2205

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:15-CV-00799-MV-KK)**

---

Patrick T. Mason, Mason & Isaacson, P.A., Gallup, New Mexico, for Plaintiffs-Appellants.

Nicholas M. Sydow, Office of the New Mexico Attorney General, Santa Fe, New Mexico, for Defendant-Appellee Bradford J. Dalley.

Daniel M. Rosenfelt, Rios Law Firm, Albuquerque, New Mexico (Linda J. Rios, Rios Law Firm, Albuquerque, New Mexico, with him on the brief), for Defendants-Appellees Harold McNeal and Michelle McNeal.

Michael B. Browde, Albuquerque, New Mexico (David J. Stout, Albuquerque, New Mexico, with him on the brief), for Amicus Curiae New Mexico Trial Lawyers Association, in support of Defendants-Appellees.

Richard W. Hughes, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP, Santa Fe, New Mexico (Donna M. Connolly, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP, Santa Fe, New Mexico, with him on the brief), for Amicus Curiae Pueblo of Santa Ana, in support of Plaintiffs-Appellants.

---

Before **HOLMES**, **PHILLIPS**, and **MORITZ**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

The Appellants, the Navajo Nation and its wholly-owned government enterprise the Northern Edge Navajo Casino (together, the "Tribe" or "Nation"), entered into a state-tribal gaming compact with New Mexico under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721. The Tribe agreed not only to waive its sovereign immunity for personal-injury lawsuits brought by visitors to its on-reservation gaming facilities, but also to permit state courts to take jurisdiction over such claims. Harold and Michelle McNeal (the "McNeals") are plaintiffs in just such a state-court action against the Tribe. Mr. McNeal allegedly slipped on a wet floor in the Northern Edge Navajo Casino. This slip-and-fall incident constituted the basis for the McNeals' tort claims against the

2

Nation for negligence, res ipsa loquitur, and loss of consortium. Judge Bradford Dalley is a New Mexico state judge who presides over the ongoing state-court proceedings. We refer to the McNeals and Judge Dalley collectively as the Appellees.

The Tribe moved to dismiss the McNeals' complaint, arguing that the state court lacked jurisdiction because neither IGRA nor Navajo law permits the shifting of jurisdiction to a state court over such personal-injury claims. The state court rejected that motion. In response, the Tribe sought declaratory relief in federal court on the basis of the same arguments. The district court granted summary judgment for the McNeals and Judge Dalley, holding that IGRA permitted tribes and states to agree to shift jurisdiction to the state courts and that Navajo law did not prohibit such an allocation of jurisdiction. The Tribe timely appealed. Prior to oral argument, we ordered the parties to submit supplemental briefs as to whether the district court had jurisdiction.

Along with the jurisdictional issue, the parties also dispute (1) whether IGRA permits an Indian tribe to allocate jurisdiction over a tort claim arising on Indian land to a state court, and (2) assuming that IGRA does allow for such an allocation, whether the Navajo Nation Council ("NNC") was empowered to shift jurisdiction to the state court under Navajo Law.

After first concluding that we have jurisdiction to hear this appeal, we determine that IGRA, under its plain terms, does not authorize an allocation of

3

jurisdiction over tort claims of the kind at issue here. Accordingly, we **reverse** the judgment of the district court and **remand** with instructions to grant the declaratory relief sought by the Nation.

## I

### A

In 1987, the Supreme Court decided *California v. Cabazon Band of Mission Indians*, in which it held that states could not regulate gaming activities on Indian land without Congressional authorization. 480 U.S. 202, 207 (1987) (rejecting California's attempted regulation of bingo and some card games), *superseded by statute*, Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, *as recognized in Michigan v. Bay Mills Indian Cmty.*, --- U.S. ----, 134 S. Ct. 2024 (2014); *see New Mexico v. Dep't of Interior* ("*N.M./DOI*"), 854 F.3d 1207, 1211 (10th Cir. 2017) ("In 1987, the Supreme Court [in *Cabazon*] held that states lack regulatory authority over gaming activities on Indian land except where Congress has expressly provided for such authority."); Kevin K. Washburn, *Recurring Problems in Indian Gaming*, 1 WYO. L. REV. 427, 428 (2001) ("The [*Cabazon*] Court held that although Congress may have given to the State of California criminal jurisdiction within Indian reservations, Congress had not given the state the lesser power of civil regulatory jurisdiction on reservations.").

In response to that "bombshell" ruling, Franklin Ducheneaux, *The Indian Gaming Regulatory Act: Background and Legislative History*, 42 ARIZ. ST. L.J.

99, 154 (2010), Congress enacted IGRA in 1988 to create a framework for states and Indian tribes to cooperate in regulating on-reservation tribal gaming, *see Pueblo of Pojoaque v. New Mexico*, 863 F.3d 1226, 1232 (10th Cir. 2017) ("In response to the Supreme Court's holding in [*Cabazon*], that states lack regulatory authority over Indian gaming on tribal lands absent congressional action, Congress enacted IGRA, 25 U.S.C. §§ 2701–2721, to provide a role for states in regulating Indian gaming activities on tribal lands."); *see also Bay Mills*, 134 S. Ct. at 2034 ("Everything—literally everything—in IGRA affords tools (for either state or federal officials) to regulate gaming on Indian lands, and nowhere else."); *N.M./DOI*, 854 F.3d at 1212 (noting that IGRA "gives states a role in the regulation of Indian gaming"); COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 12.01, at 876 (Nell Jessup Newton ed., 2012) [hereinafter, "COHEN'S HANDBOOK"] ("IGRA accommodated the interests of tribes in pursuing gaming but also set forth a federal regulatory regime, and gave a powerful role to states by providing for significant state involvement in the decision to permit casino-style gaming."). IGRA enables states and tribes to negotiate compacts addressing a range of topics relating to tribal gaming. *See* 25 U.S.C. § 2710(d).

Under IGRA, tribes that seek to conduct gaming activities are incentivized to negotiate gaming compacts with states because, absent such compacts, the most "lucrative" form of gaming—Class III gaming—is forbidden. *N.M./DOI*, 854 F.3d at 1212 ("The present case concerns Class III gaming, which includes the

5

most lucrative forms of gaming."); *see* § 2710(d)(1); *Bay Mills*, 134 S. Ct. at 2035

("[A] tribe cannot conduct class III gaming on its lands without a compact . . . .");

*Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 47 (1996) ("The Indian Gaming

Regulatory Act provides that an Indian tribe may conduct certain gaming

activities only in conformance with a valid compact between the tribe and the

State in which the gaming activities are located."). "Class III gaming . . .

includes casino games, slot machines, and horse racing." *Bay Mills*, 134 S. Ct. at

2028; *see* Washburn, *supra*, at 429 ("IGRA provides that tribes may engage in

Class III casino-style gaming only if they first negotiate 'compacts' with

states.").[1]

---

[1] Notably, Congress also sought to encourage states to come to the gaming-compact bargaining table by statutorily obliging them in IGRA to negotiate in good faith and abrogating their sovereign immunity if they did not do so. § 2710(d)(3)(A), (7)(A); *see N.M./DOI*, 854 F.3d at 1211 (noting that "IGRA provides that when a tribe believes a state has failed to negotiate in good faith, the tribe may sue in federal court"). However, the Supreme Court defanged this enforcement procedure when it held in *Seminole Tribe* that "Congress lacked the authority to make states subject to suit by Indian tribes in federal court." *N.M./DOI*, 854 F.3d at 1211; *see Seminole Tribe*, 517 U.S. at 72 ("[W]e reconfirm that the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is an area, like the regulation of Indian commerce, that is under the exclusive control of the Federal Government."); *see also* Ducheneaux, *supra*, at 177 ("[E]ight years after the enactment of IGRA, the Supreme Court, in the case of *Seminole Tribe v. Florida* . . . held that Congress did not have power to subject states to suits under the Commerce clause . . . . This decision upset the delicate balance Congress had adopted in the Tribal-State Compact provision and, as feared by Congress, put the tribes at the mercy of states in compact negotiations." (footnotes omitted)); Rebecca Tsosie, *Negotiating Economic Survival: The*

(continued...)

Importantly, IGRA expressly prescribes the matters that are permissible subjects of gaming-compact negotiations between tribes and states. § 2710(d)(3)(C). In the tribal-state compact that the Tribe and New Mexico entered into, the Tribe agrees not only to waive its sovereign immunity as to personal-injury claims brought by visitors to its casinos but also to permit such claims to be brought in state court. *See* Aplt.'s App. at 26 (State-Tribal Compact, dated Nov. 6, 2003).[2] More specifically, the compact permits such state-court

_____

[1](...continued)
*Consent Principle and Tribal-State Compacts Under the Indian Gaming Regulatory Act*, 29 ARIZ. ST. L.J. 25, 71 (1997) (noting that, as a result of *Seminole Tribe*, many states have "refus[ed] to negotiate further tribal-state compacts" which has left the tribes with "limited remedies").

[2]     The relevant portions of the compact read:

SECTION 8. Protection of Visitors.

    A.     Policy Concerning Protection of Visitors. The safety and protection of visitors to a Gaming Facility is a priority of the Nation, and it is the purpose of this Section to assure that any such persons who suffer bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation. To that end, in this Section, and subject to its terms, the Nation agrees to carry insurance that covers such injury or loss, agrees to a limited waiver of its immunity from suit, and agrees to proceed either in binding arbitration proceedings or in a court of competent jurisdiction, at the visitor's election, with respect to claims for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise. For purposes of this Section, any such claim may be brought in state district court, including claims arising on

(continued...)

7

litigation, "unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court." *Id.*

**B**

The present dispute has its genesis in a slip-and-fall case that the McNeals

---

[2](...continued)
> tribal land, unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.
>
> . . . .
>
>     D. Specific Waiver of Immunity and Choice of Law. The Nation, by entering into this Compact and agreeing to the provisions of this Section, waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage up to the amount of fifty million dollars ($50,000,000) per occurrence asserted as provided in this Section. This is a limited waiver and does not waive the Nation's immunity from suit for any other purpose. The Nation shall ensure that a policy of insurance that it acquires to fulfill the requirements of this Section shall include a provision under which the insurer agrees not to assert the defense of sovereign immunity on behalf of the insured, up to the limits of liability set forth in this Paragraph. The Nation agrees that in any claim brought under the provisions of this Section, New Mexico law shall govern the substantive rights of the claimant, and shall be applied, as applicable, by the forum in which the claim is heard, except that the tribal court may but shall not be required to apply New Mexico law to a claim brought by a member of the Nation.

Aplt.'s App. at 26–27.

8

brought in New Mexico state court. Mr. McNeal allegedly fell on a wet bathroom floor in the Navajo Northern Edge Casino. He and his wife sued the Nation, which owns and operates the casino, claiming negligent maintenance, res ipsa loquitur, and loss of consortium. In a motion to dismiss, the Tribe argued that the state court lacked subject-matter jurisdiction for two reasons. First, it contended that this was so because IGRA does not authorize states and tribes to enter into compacts that shift jurisdiction over tort claims stemming from events on Indian country to state court—*viz.*, IGRA does not contemplate that the shifting of jurisdiction over such claims is a permissible subject of compact negotiations. Second, it argued that NNC was not authorized to shift jurisdiction over tort claims against the Nation, like those of the McNeals, to state court.

The state court denied the Tribe's motion to dismiss on the basis that the New Mexico Supreme Court, in *Doe v. Santa Clara Pueblo*, had already decided the issue. 154 P.3d 644, 646 (N.M. 2007) ("We now . . . hold[] that state courts have jurisdiction over personal injury actions filed against [the tribes] arising from negligent acts alleged against casinos owned and operated by the [tribes] and occurring on the [tribes'] lands."). Subsequently, Judge Dalley took over the state court case.

The Tribe then brought this suit for a declaratory judgment in the U.S. District Court for the District of New Mexico. The Tribe sought a declaratory judgment "that [the] Indian Gaming Regulatory Act does not permit the shifting

9

of jurisdiction from tribal courts to state courts over personal injury lawsuits brought against tribes or tribal gaming enterprises, and that the New Mexico state courts do not have jurisdiction over lawsuits such as the *McNeal Lawsuit*." Aplt.'s App. at 11–12. (Am. Compl., dated Sept. 21, 2015).

The Tribe moved for summary judgment, and the district court denied relief. The court first addressed whether the Nation inherently had the authority to permit state court jurisdiction over claims arising in Indian country, and held that it did. It then concluded that NNC was authorized under Navajo law to shift jurisdiction over tort claims against the Nation, like those of the McNeals, to state court. Lastly, the court addressed the IGRA question, holding that IGRA authorized such shifting of jurisdiction as to personal-injury tort claims either under 25 U.S.C. § 2710(d)(3)(C)(i) and (ii), when read together; or under the catch-all provision, § 2710(d)(3)(C)(vii). Concluding thereafter that "there [were] no legal issues remaining to be resolved," the district court dismissed the case. *Id.* at 163 (Mem. Op. & Order, dated Aug. 3, 2016). The Tribe timely appealed from the district court's judgment.

## II

We first address our jurisdiction. Because federal courts have limited subject-matter jurisdiction, "we 'may only hear cases when empowered to do so by the Constitution or by act of Congress.'" *Gad v. Kan. State Univ.*, 787 F.3d 1032, 1035 (10th Cir. 2015) (quoting *Radil v. Sanborn W. Camps, Inc.*, 384 F.3d

10

1220, 1225 (10th Cir. 2004)). "[W]e always have an independent obligation—no matter the stage of litigation—to consider whether a case creates a live case or controversy and belongs in federal court." *Id.*; *accord Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). We review de novo whether subject-matter jurisdiction is proper. *See, e.g.*, *1mage Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006); *Austl. Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1234 (10th Cir. 2006).

Consistent with our independent obligation, we ordered the parties to submit briefing regarding, *inter alia*, whether, under 28 U.S.C. § 1331, the district court had federal jurisdiction over this action when the Tribe was raising what (at first blush) appeared to be federal defenses to pure state-law claims. Since this briefing, that jurisdictional issue has been resolved by a panel of our court in *Ute Indian Tribe v. Lawrence*, 875 F.3d 539 (10th Cir. 2017), which ruled that federal courts do have jurisdiction in circumstances like those presented here.

Specifically, in *Lawrence*, a non-Indian brought a breach-of-contract claim against the Ute Indian tribe in Utah state court. Seeking to halt the state proceeding, the Tribe filed suit in federal district court, "asserting . . . that the state court lacked subject-matter jurisdiction to hear the case." *Id*. at 540. The district court, in turn, determined that it did not have jurisdiction to consider the Tribe's challenge to the state court's jurisdiction. *Id*. The Tribe appealed, and we reversed the district court's determination, holding that the Ute Tribe's

11

"claim—that federal law precludes state-court jurisdiction over a claim against Indians arising on the reservation—presents a federal question that sustains federal jurisdiction." *Id.*

In reaching that conclusion, the panel first analyzed the "long history of federal law regarding Indian affairs," *id.* at 541, and observed both that "federal law regulates a tribe's right to exercise jurisdiction over non-Indians," *id.* at 542, and "that state adjudicative authority over Indians for on-reservation conduct is greatly limited by federal law," *id.* From those principles, we determined that "federal courts generally have jurisdiction to enjoin the exercise of state regulatory authority (which includes judicial action) contrary to federal law," *id.* at 543, and reasoned that the tribe's suit arose under federal law because it was "seeking injunctive and declaratory relief against state regulation (the state-court proceeding) that it claims is preempted by federal law," *id.* at 547.

*Lawrence*'s analysis is directly applicable here: the Nation here seeks declaratory relief under federal law against state regulation, *viz.*, the state-court proceeding, claiming that federal law preempts it. As such, we properly exercise jurisdiction over this appeal under § 1331.[3]

### III

Proceeding to the merits, this appeal presents two issues, one of federal law

---

[3] Because we conclude that we may exercise jurisdiction under § 1331, we need not reach the parties' remaining jurisdictional arguments.

12

and one of Navajo law. First, the Nation asserts that the district court erred in concluding that IGRA authorizes an Indian tribe to allocate jurisdiction over a tort claim arising on Indian land to a state court. Second, even assuming that IGRA does allow a tribe to allocate jurisdiction of such claims to state courts, the Nation submits that the NNC was not empowered to shift jurisdiction to the state court as a matter of Navajo law. Because we decide the first issue in the Nation's favor, we need not reach the question of Navajo law.

## A

It is axiomatic that absent clear congressional authorization, state courts lack jurisdiction to hear cases against Native Americans arising from conduct in Indian country. *See, e.g.*, *Williams v. Lee*, 358 U.S. 217, 223 (1959) ("There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent [i.e., plaintiff] is not an Indian . . . . If this power [of Indian governments over their territory] is to be taken away from them, it is for Congress to do it."); *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 15 (1987) ("If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law."); *accord* COHEN'S HANDBOOK, *supra*, § 7.03[1][a][ii], at 608. It is also a well-settled principle that "Congress possesses

13

plenary power over Indian affairs, including the power to modify or eliminate tribal rights." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998); *accord Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978); *United States v. Shavanaux*, 647 F.3d 993, 997 (10th Cir. 2011).

Consequently, congressional approval is necessary—i.e., it is a threshold requirement that must be met—before states and tribes can arrive at an agreement altering the scope of a state court's jurisdiction over matters that occur on Indian land. *See Kennerly v. Dist. Court of Ninth Judicial Dist. of Mont.*, 400 U.S. 423, 427 (1971) (per curiam) (holding that the "unilateral action of the Tribal Council was insufficient to vest" the state courts with jurisdiction over a civil suit against an Indian defendant stemming from a transaction occurring on tribal land because Congress did not expressly authorize such tribal-council consent as a means for states to take jurisdiction); *Fisher v. Dist. Court of Sixteenth Judicial Dist. of Mont., in & for Rosebud Cty.*, 424 U.S. 382, 388 (1976) (per curiam) (holding that Montana courts could not exercise jurisdiction over adoption proceedings involving Indians on Indian land because "[n]o federal statute sanction[ed] this interference with tribal self-government"); COHEN'S HANDBOOK, *supra*, § 7.07[4], at 673 ("Because of federal supremacy over Indian affairs, tribes and states may not make agreements altering the scope of their jurisdiction in Indian country absent congressional consent."); *cf. Bay Mills*, 134 S. Ct. at 2032 (noting that "[u]nless Congress has authorized [the present] suit, [Supreme Court] precedents

14

demand that it be dismissed").

Congress has "authorized" the tribes and states to make such jurisdiction-altering agreements "in only a few specific circumstances"; the area of tribal-state gaming compacts represents one such circumstance. COHEN'S HANDBOOK, *supra*, § 7.07[4], at 673 & n.92; *see Bay Mills*, 134 S. Ct. at 2032 (acknowledging that IGRA "partially abrogate[d] tribal sovereign immunity").

All of that background leads us to the question presented: whether IGRA authorizes tribes to enter into gaming compacts with states that allocate jurisdiction to state courts with respect to state-law tort claims like the McNeals'. For the reasons that follow, we conclude it does not.[4]

As noted, "IGRA authorizes states and Indian nations to enter into compacts associated with the operation of certain forms of tribal gaming known

---

[4] This background should provide a context for understanding why we need not reach the question of Navajo law noted above: because Congress, through IGRA, has not authorized tribes to enter into compacts with states allocating jurisdiction to state courts over tort claims arising on Indian land like those prosecuted by the McNeals, whether the NNC's actions under Navajo law would have permitted such a jurisdictional transfer is immaterial. In other words, because we conclude that Congress has not authorized the shifting of jurisdiction over the tort claims at bar by way of IGRA, our analysis is at an end; we need not decide more because "the negotiated terms of the Compact cannot exceed what is authorized by the IGRA." *Pueblo of Santa Ana v. Nash*, 972 F. Supp. 2d 1254, 1266 (D.N.M. 2013); *see* COHEN'S HANDBOOK, *supra*, § 6.04[3][d][iii], at 569 (noting that "IGRA establishes *exclusive* federal jurisdiction over civil actions involving Indian gaming and gaming contract disputes, thereby supplanting any civil jurisdiction over private lawsuits that states might [otherwise] have acquired over such matters" by other congressional action (emphasis added)).

15

as Class III gaming." COHEN'S HANDBOOK, *supra*, § 6.04[3][d][iii], at 569.

Specifically, subparagraph (A) of § 2710(d)(3) of IGRA provides that

> Any Indian tribe having jurisdiction over the Indian lands upon which a class III *gaming activity* is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of *gaming activities*.

25 U.S.C.A. § 2710(d)(3)(A) (emphases added).

Then subparagraph (C) of this same section provides:

> Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to–
>
> (i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are *directly related to, and necessary for*, the licensing and regulation of *such activity*;
>
> (ii) *the allocation of criminal and civil jurisdiction* between the State and the Indian tribe necessary for the enforcement of *such* laws and regulations;
>
> (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;
>
> (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;
>
> (v) remedies for breach of contract;
>
> (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and
>
> (vii) any *other* subjects that are directly related to *the operation* of gaming activities.

16

*Id.* § 2710(d)(3)(C)(i)–(vii) (emphases added).

The district court held that a compact could be used to shift jurisdiction to state courts for tort claims stemming from conduct in an on-reservation gaming facility based on either clauses (i) and (ii), when read together; or clause (vii). *See* Aplt.'s App. at 191–97. No party suggests any other basis under IGRA for shifting jurisdiction over tort claims. Reviewing the district court's statutory interpretation de novo, *see United States v. Porter*, 745 F.3d 1035, 1040 (10th Cir. 2014); *United States v. Willis*, 476 F.3d 1121, 1124 (10th Cir. 2007), we address each theory in turn.

**B**

**1**

The Nation first contends that the district court erred in concluding that IGRA authorizes an Indian tribe to shift jurisdiction to state courts over tort claims stemming from conduct on Indian casino property based on clauses (i) and (ii) of subparagraph (C) of § 2710(d)(3). The Nation asserts that IGRA was not intended to allow for the shifting of jurisdiction from tribal courts to state courts for private tort lawsuits such as the one at bar, but permits the shifting of jurisdiction for only those activities that are "'necessary for the enforcement' of laws and regulations that are 'directly related to and necessary for' the licensing and regulation of class III gaming activities." Aplt.'s Opening Br. at 15 (quoting § 2710(d)(3)(C)).

17

The McNeals acknowledge that the language "gaming activity" in IGRA "refers to gambling, something that typically takes place in a casino," and more specifically Class III gaming, but stress that "[c]asinos house not only games of chance, but they are also entertainment venues where visitors come not only to gamble but also to eat and drink, and where like [Mr. McNeal], they may use the restroom." McNeal Aplees.' Br. at 20. Therefore, the McNeals reason that it is "unrealistic" to interpret IGRA's authorization for compacting regarding the application of state civil laws relating to the regulation of Class III gaming—i.e., to "such activity," § 2710(d)(3)(C)(i)—to be restricted to laws regarding gambling activities, McNeal Aplees.' Br. at 20 (noting that the regulation of Class III gaming is not restricted to "slot odds, maximum bets and the thickness of felt at the blackjack tables" but rather relates generally to "activities that go on in a casino"). Judge Dalley takes a similar position: specifically, he argues that the agreement in the tribal-state compact to "regulate" with respect to injuries like those that the McNeals allegedly suffered, by applying "New Mexico tort law, enforceable in state court[,] is within the proper scope of a gaming compact under the IGRA." J. Dalley's Br. at 23; *see id.* ("Class III gaming activities do not take place in a vacuum. Visitors who go to the casino to gamble will necessarily use the casino's bathroom.").

The Nation counters that personal-injury claims sounding in tort do not involve civil laws "directly related to, and necessary for," the regulation of Class

18

III gaming activities, § 2710(d)(3)(C)(i), and therefore IGRA does not authorize compacting with respect to the application of such laws under the circumstances here. We agree with the Nation.

At bottom, the parties' dispute relates to the scope of the term "class III gaming activity." In *Bay Mills*, the Supreme Court construed "class III gaming activity" to mean "just what it sounds like—the stuff involved in *playing* class III games," and in doing so, expressly interpreted § 2710(d)(3)(C)(i). 134 S. Ct. at 2032 (emphasis added). The Court continued: "[Sections 2710(d)(3)(C)(i) and 2710(d)(9), which authorize tribes to enter into management contracts for Class III gaming] make perfect sense if 'class III gaming activity' is what goes on in a casino—[that is,] *each roll of the dice and spin of the wheel*." *Id.* (emphasis added). The Court further concluded that this use of the term was consistent throughout the statute, holding that "the gaming activity is the *gambling* in the poker hall, not the proceedings of the off-site administrative authority," and that the statute's enforcement power over "gaming activity" was a power "to shut down crooked blackjack tables, not the tribal regulatory body meant to oversee them." *Id.* at 2033 (emphasizing, "[t]he 'gaming activit[y]' is (once again) the gambling" (alteration in original)).

The Court's analysis in *Bay Mills* leads us to the clear conclusion that Class III gaming activity relates only to activities actually involved in the *playing* of the game, and not activities occurring in proximity to, but not inextricably

19

intertwined with, the betting of chips, the folding of a hand, or suchlike. *See Harris v. Lake of Torches Resort & Casino*, 862 N.W. 2d 903, 2015 WL 1014778, at \*5 (Wis. Ct. App. Mar. 10, 2015) (per curiam) (unpublished) ("Applying th[e *Bay Mills*] definition, Harris—who was injured while working as a cook at a restaurant located in a casino—was not injured in connection with a class III gaming activity."); *see also California v. Iipay Nation of Santa Ysabel*, No. 314CV02724AJBNLS, 2016 WL 10650810, at \*11 (S.D. Cal. Dec. 12, 2016) (unpublished) ("[T]he gaming activity is not the software-generated algorithms or the passive observation of the proxy monitors. Rather, it is the patrons' act of selecting the denomination to be wagered, the number of games to be played, and the number of cards to play per game."). And, even assuming that tort law is a form of "regulation" of "the operation of gaming activities," as the district court correctly observed, *see* Aplt.'s App. at 192, actions arising in tort in circumstances similar to this one are not "directly related to, and necessary for, the licensing and regulation of such activity," § 2710(d)(3)(C)(i), because they do not stem from the actual playing of the casino game.[5] Put another way, if

---

[5] We are not obliged to read the term "necessary" as meaning "absolutely necessary" or "indispensable." *See Fish v. Kobach*, 840 F.3d 710, 734–35 (10th Cir. 2016); *accord United States v. Comstock*, 560 U.S. 126, 134 (2010); *In re Mile Hi Metal Sys., Inc.*, 899 F.2d 887, 893 (10th Cir. 1990). Nevertheless, the use of the word "necessary" in clause (i) evinces the narrowing of the sphere of acceptable laws and regulations, especially when compared with clause (vii), which omits the "necessary for" condition and speaks only in terms

(continued...)

20

individuals are not participating in Class III gaming activities on Indian land—as *Bay Mills* understands them—when they are allegedly harmed by a tortfeasor, we are hard-pressed to see how tort claims arising from their activities could be "directly related to, and necessary for, the licensing and regulation" of Class III gaming activities.

This conclusion is ineluctable when the plain statutory text is viewed through the prism of *Bay Mills*. *See United States v. Nichols*, 184 F.3d 1169, 1171 (10th Cir. 1999) ("[W]here a statute is clear on its face, we give its words literal effect."); *cf.* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 3 (2012) ("In an age when democratically prescribed texts (such as statutes, ordinances, and regulations) are the rule, the judge's principal function is to give those texts their fair meaning."). Accordingly, IGRA, in clause (i), does not authorize compacting regarding the application of state tort law under the circumstances here.[6]

---

[5](...continued)
of "subjects that are *directly related* to the operation of gaming activities." § 2710(d)(3)(C)(vii) (emphasis added).

[6]     The Appellees present various arguments seeking to distinguish *Bay Mills*; none are availing. Their first two arguments essentially contend that the *Bay Mills* Court did not directly assess what terms may be included in a compact, *see* McNeal Aplees.' Br. at 20–21; J. Dalley's Br. at 23 n.9, but instead addressed a different issue. *See Bay Mills*, 134 S. Ct. at 2028 ("The question in this case is whether tribal sovereign immunity bars Michigan's suit against the Bay Mills Indian Community for opening a casino outside Indian lands. We hold that
(continued...)

21

immunity protects Bay Mills from this legal action."). This argument, however, does not move the ball for them because we are bound to follow both the holding and the *reasoning*, even if dicta, of the Supreme Court. *See Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008) ("Moreover, even if the Court's rejection of the reasonable apprehension test could be plausibly characterized as *dicta*, our job as a federal appellate court is to follow the Supreme Court's directions, not pick and choose among them as if ordering from a menu."); *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996) ("While these statements are dicta, this court considers itself bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements."). And, as discussed, the Supreme Court's explicit interpretation of clause (i) inexorably leads to our present conclusion.

The Appellees also present a third argument. Specifically, they observe that this case involves the interpretation of provisions that enhance tribal sovereign immunity, i.e., permit the Nation to use its jurisdiction as a bargaining chip, whereas the provisions at issue in *Bay Mills* abrogated tribal sovereignty; consequently, they reason that we should read the provisions here more broadly than the *Bay Mills* Court did because of the differing effects the constructions have on Indian sovereignty interests. *See* McNeal Aplees.' Br. at 21–22; J. Dalley's Br. at 26–27 ("Here, the state courts' interpretation of the IGRA as permitting jurisdiction promotes, and does not diminish, tribal self-determination."). This argument, at base, suggests that Congress must have intended the courts to construe IGRA in a broader sense in circumstances when the effect of the construction will be to enhance tribal sovereignty. The Appellees cite limited authority in support of their argument, but the authority they do cite indicates that they are relying on the well-established Indian canon of statutory interpretation—that is, the canon that provides that "statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." *Bryan v. Itasca Cty., Minn.*, 426 U.S. 373, 392 (1976) (quoting *Alaska Pac. Fisheries Co. v. U.S.*, 248 U.S. 78, 89 (1918)); *accord N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1191 (10th Cir. 2002). The Tribe relies on this canon too, but contends that it militates in favor of a conclusion that IGRA does not authorize the allocation of jurisdiction to state courts. As noted in footnote 11, *infra*, we eschew reliance on this canon because it typically plays a significant role only when the statute is ambiguous, and we have concluded that the IGRA provisions at issue are not ambiguous. *See*

(continued...)

22

We acknowledge that, in thoughtful decisions, the New Mexico Supreme Court in *Doe* and the district court here came to contrary conclusions. In particular, the New Mexico Supreme Court concluded that "[t]ort suits are . . . related to gaming activity in helping ensure that gaming patrons are not exposed to unwarranted dangers, something that inures to the benefit of the Tribes." 154 P.3d at 655. In support of its position, the *Doe* court relied on the rationale that Congress "could rationally conclude that tribes ought not to be foreclosed from negotiating such provisions perceived to be in their own interest, and as 'directly related to, and necessary for, the licensing and regulation' of gaming." *Id.* The

---

[6](...continued)
*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) (noting that "statutes are to be construed liberally in favor of the Indians, with *ambiguous* provisions interpreted to their benefit" (emphasis added)); *E.E.O.C. v. Cherokee Nation ("E.E.O.C/Cherokee")*, 871 F.2d 937, 939 (10th Cir. 1989) (collecting cases indicating that canon of construction applies if there is ambiguity in the statute). For this same reason, we find Appellees' argument predicated on this canon to be unpersuasive. Furthermore, we underscore that we have "no roving license, even in ordinary cases of statutory interpretation, to disregard clear language simply on the view that . . . Congress 'must have intended' something broader." *Bay Mills*, 134 S. Ct. at 2034 (quoting pleadings); *accord Wis. Cent. Ltd. v. United States*, --- S. Ct. ----, No. 17-530, 2018 WL 3058014, at *5 (June 21, 2018) ("It is not our function 'to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have' intended." (quoting *Henson v. Santander Consumer USA Inc.*, --- U.S. ----, 137 S. Ct. 1718, 1725 (2017))); *cf.* Scalia & Garner, *supra*, at 56 ("[T]he purpose must be derived from the text [of the applicable statute], not from extrinsic sources such as . . . an assumption about the legal drafter's desires."). In sum, for the foregoing reasons, we find the Appellees' attempts to distinguish *Bay Mills* unavailing.

23

district court also arrived at a similar conclusion: "Because tort claims alleged against Indian gaming facilities are 'directly related to' the regulation of tortious conduct arising out of Indian gaming, jurisdictional issues arising from such tort claims may be the subject of negotiation for a tribal-state compact." Aplt.'s App. at 193.

While we are comfortable assuming that tort, and more specifically personal-injury lawsuits, constitute a type of regulation, we are unable to discern how applying this form of regulation to a slip-and-fall event, like Mr. McNeal's, is "directly related to, and necessary for the licensing and regulation," § 2710(d)(3)(C)(i), of Class III gaming activity, as *Bay Mills* conceives of it. For example, whether a casino employee is negligent in cleaning up spilled water on the floor which results in a patron falling has nothing to do with the actual regulation or licensing of Class III gaming, *viz.*, "each roll of the dice and spin of the wheel." *Bay Mills*, 134 S. Ct. at 2032. Put differently, just as the licensing or regulation of gaming activity only directly relates to things akin to "gambling in the poker hall" and not to "the proceedings of the off-site administrative authority," *id.* at 2033, it also does not relate to claims arising out of occurrences that happen in proximity to—but not as a result of—the hypothetical card being dealt or chip being bet. Therefore, when viewed through the prism of *Bay Mills*, we respectfully conclude that the reading of IGRA that we adopt here is the correct one, and that the district court and the New Mexico Supreme Court are

24

mistaken.

In discerning whether IGRA authorizes tribes to allocate jurisdiction regarding tort claims like the McNeals' to state courts, we also look to the text of clause (ii) of subparagraph (C). *See King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (noting "the cardinal rule that a statute is to be read as a whole"); *accord Massachusetts v. Morash*, 490 U.S. 107, 115 (1989). Clause (ii) is entirely congruent with, and strongly reinforces, our view of the limitations of IGRA's authorization of jurisdictional allocations. Notably, this is the only clause in subparagraph (C) that explicitly authorizes tribes to allocate jurisdiction to the states. Specifically, recall that, by its terms, it provides for "the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations." *See* § 2710(d)(3)(C)(ii). It is clear to us that this provision applies only to the "laws and regulations" referenced in clause (i). The pronoun "such" in clause (ii) refers unambiguously back to the "laws and regulations" in the immediately preceding provision, clause (i). And those laws and regulations are ones that are "directly related to, and necessary for, the licensing and regulation of such activity." § 2710(d)(3)(C)(i). And, as we have established *supra*, the "activity" in clause (i)'s phrase "such activity" is "what goes on in a casino—[that is,] *each roll of the dice and spin of the wheel*." *Bay Mills*, 134 S. Ct. at 2032 (emphasis added).

It necessarily follows that the allocation of civil jurisdiction referenced in

25

clause (ii) pertains solely to the allocation that is "necessary for the enforcement of the laws and regulations," § 2710(d)(3)(C)(ii), that are "directly related to, and necessary for, the licensing and regulation of" the playing of Class III games, § 2710(d)(3)(C)(i)—and not for the enforcement of laws and regulations pertaining to such tangential matters as the safety of walking surfaces in Class III casino restrooms. Put another way, because tort law in the circumstances here does not directly relate to the licensing and regulation of gambling itself, clause (ii)—which depends upon clause (i) to define the scope of its allocation of civil jurisdiction—does not authorize tribes to agree in gaming compacts to shift (i.e., allocate) jurisdiction to state courts over tort claims like those here.[7]

---

[7] We pause to highlight that our holding only pertains to the circumstances presented here. More specifically, we do not intend by this holding to categorically negate the possibility that certain classes of tort or personal-injury claims stemming from conduct on Indian land might conceivably satisfy the statutory conditions for tribal allocation of jurisdiction to the states under our plain reading of clauses (i) and (ii) of IGRA. Consider, for example, a casino patron at a roulette table: during the course of the game, an errant ball flies and hits the patron in the eye, causing damage to the patron. Or, in a different situation, a patron is playing on a dysfunctional slot machine that electrocutes the patron, again resulting in some harm. In both of those instances, it is at least arguable that the patron's injuries resulted directly from gaming activity, within the meaning of *Bay Mills*, i.e., "what goes on in a casino—each roll of the dice and spin of a wheel." 134 S. Ct. at 2032. Assuming *arguendo* this is so, the harmed plaintiffs could argue—at least colorably—that the tort laws they plan to invoke in their claims are "civil laws and regulations . . . directly related to, and necessary for, the licensing and regulation, of" the gaming activities that caused them harm, and that the allocation of jurisdiction was "necessary for the enforcement" of those tort laws. § 2710(d)(3)(C)(i), (ii). In short, the hypothetical plaintiffs could argue (at least colorably) that the tribe running the
(continued...)

26

**2**

Appellees present two principal counterarguments, but neither is persuasive. First, they contend that IGRA's legislative history supports the conclusion that the statute was created with the intent of permitting tribes to allocate their jurisdiction when they deemed it in their favor to do so. *See* McNeal Aplees.' Br. at 9–13; J. Dalley's Br. at 19–23. However, we need not consider legislative history where, as here, we find the statutory language unambiguous.[8] *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) ("[R]eliance on legislative history is unnecessary in light of the statute's unambiguous language." (quoting *Milavetz, Gallop & Milavetz, P.A. v. United*

---

[7](...continued)
casino at issue would have been authorized under IGRA's plain terms to allocate jurisdiction to the state over their tort claims. We need not and do not express any opinion on whether such hypothetical plaintiffs—or similarly situated ones—could succeed on such an argument because the circumstances of those plaintiffs are not before us. The McNeals' circumstances are. And what is clear in a slip-and-fall case, like this one, is that a plaintiff's harm cannot plausibly be said to have resulted from gaming activity, within the meaning of *Bay Mills*—that is, from the playing of dice, the pulling of a slot machine, or other participation in Class III gambling. And such a plaintiff, like the McNeals, cannot argue that the tribe would have been authorized under IGRA's plain terms to shift jurisdiction over his or her tort claims to the state courts.

[8]     In this regard, we find common ground with Justice Minzner's dissent in *Doe*, in which he reasoned that "[h]ad Congress intended for such [tort] claims to be included, . . . IGRA would have been more explicit, and we would not need to parse legislative history for indicia of legislative intent." 154 P.3d at 658 (Minzner, J. dissenting). Based on our reading of IGRA's plain text, we reject the *Doe* majority's reliance on legislative history.

*States*, 559 U.S. 229, 236 n.3 (2010))); *accord United States v. Woods*, 571 U.S. 31, 46 n.5 (2013) ("Whether or not legislative history is ever relevant, it need not be consulted when, as here, the statutory text is unambiguous."); *United States v. Hunt*, 456 F.3d 1255, 1268 (10th Cir. 2006) ("We recognize that it is not necessary to resort to legislative history when statutory language is unambiguous.").  Moreover, had Congress wanted to permit tribes to allocate jurisdiction in such cases, it could have crafted language to effectuate this purpose, but it did not do so.  *See Pueblo of Santa Ana v. Nash*, 972 F. Supp. 2d 1254, 1265 (D.N.M. 2013) (declining to look for guidance in IGRA's legislative history and "opt[ing] instead to rely on the clear statutory structure of IGRA," and noting in this regard that Congress could have "worded subparagraph (ii) in a way that obviously or necessarily included a shifting of jurisdiction over such claims [i.e., tort claims involving serving alcohol to intoxicated persons]," but it did not do so); *cf. Bay Mills*, 134 S. Ct. at 2033–34 ("[T]his Court does not revise legislation . . . just because the text as written creates an apparent anomaly as to some subject it does not address.  Truth be told, such anomalies often arise from statutes, if for no other reason than that Congress typically legislates by parts—addressing one thing without examining all others that might merit comparable treatment.").

Appellee's second argument is one that we considered and rejected in our independent assessment of the meaning of clause (i)—that is, the argument that

28

tort law is "directly related to, and necessary for, the licensing and regulation of" gaming activity, within the meaning of clause (i). § 2710(d)(3)(C)(i). Accordingly, we conclude that Appellees' two arguments come up short.

***

In sum, we conclude that clauses (i) and (ii), by their plain meaning, do not authorize tribes to allocate during the compacting process jurisdiction to state courts for tort claims such as the McNeals' arising on Indian land. We therefore turn to the second question of whether clause (vii)'s catch-all provision permits tribal-state compacts to serve as vehicles for shifting civil jurisdiction over such tort claims.

## C

### 1

The Nation next challenges the district court's alternative holding that even if the first two clauses of § 2710(d)(3)(C) do not permit the allocating of jurisdiction during the compacting process, the Nation could have allocated jurisdiction over the McNeals' tort claims pursuant to clause (vii), the catch-all provision. Aplt.'s App. at 193 (district court reasoning that "[b]ecause tort liability resulting from 'the operation of gaming activities' is 'directly related to' the same [i.e., operation], the catchall provision . . . also provides authority for Tribes and states to negotiate the allocation of jurisdiction of such tort claims"). As noted above, clause (vii) provides that a compact may include "any other

29

subjects that are directly related to the operation of gaming activities." § 2710(d)(3)(C)(vii). We ultimately conclude that the district court's reading of clause (vii) is mistaken and thus sustain the Nation's challenge.

Given that we must "presume that [Congress] says in a statute what it means and means in the statute what it says there," *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (collecting cases); *accord Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 249 (1985), it is significant that the subject of jurisdictional allocation is only mentioned in clause (ii). As the Nation puts it, "there is no language in that section [i.e., clause (vii)] that pertains to the allocation of jurisdiction between the tribe and the state." Aplt.'s Reply Br. at 12 (emphasis omitted). This omission provides a significant clue that Congress did not contemplate that this provision would cover the topic of the allocation of jurisdiction over civil lawsuits between states and tribes. Although the Appellees argue that the legislative history points to a different result, this omission militates in favor of a conclusion that our "judicial inquiry into the applicability of [clause (vii)] begins and ends with what [clause (ii)] does say and with what [clause (vii)] does not." *Germain*, 503 U.S. at 254; *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("The task of resolving the dispute over the meaning of § 506(b) begins where all such inquiries must begin: with the language of the statute itself. In this case it is also where the inquiry should end, for where, as here, the statute's language is plain, 'the sole function

30

of the courts is to enforce it according to its terms.'" (citation omitted) (quoting

*Caminetti v. United States*, 242 U.S. 470, 485 (1917))). Here, clause (ii) speaks

directly and specifically to tribal-state compacting regarding the allocation of

jurisdiction, whereas clause (vii) does not explicitly raise the topic of

jurisdictional allocation. This constitutes a significant clue that Congress did not

intend for this provision to relate to tribal-state compacting regarding the

allocation of jurisdiction.

To be sure, clause (vii) functions as a catch-all provision, and,

consequently, Congress expressed its scope in broad terms, to encompass "any

other subjects that are directly related to the operation of gaming activities,"

§ 2710(d)(3)(C)(vii). But the key word here is "other."[9] Typically, statutory

---

[9] In reaching the opposite conclusion than the one we ultimately do regarding the import of clause (vii)—i.e., that the clause permits the allocation of jurisdiction—the district court, quite significantly, omitted the term "other" from its analysis: "This Section allows the Tribes and states to negotiate regarding 'any . . . subjects that are directly related to the operation of gaming activities.'" Aplt.'s App. at 193 (quoting 25 U.S.C. § 2710(d)(3)(C)(vii)). The court then concluded that "the catchall provision . . . provides authority for Tribes and states to negotiate the allocation of jurisdiction of such tort claims." *Id*. As we will explicate *infra*, adding the term "other" back into clause (vii) completely alters its meaning and undermines the district court's determination. In brief, the term "other" indicates that the catchall provision covers subjects that have not already been addressed by the other clauses of subparagraph (C). And, because the subject of jurisdictional allocation is undisputedly considered in clause (ii), a plain reading of clause (vii) in light of the rest of subparagraph (C), supports the conclusion that clause (vii) does not discuss jurisdictional considerations. *See United States v. Bishop*, 412 U.S. 346, 356 (1973) ("We continue to recognize that context is important in the quest for the word's meaning."); *accord United*

(continued...)

31

language is given its "ordinary, everyday" meaning, unless the context suggests otherwise. *Toomer v. City Cab*, 443 F.3d 1191, 1194 (10th Cir. 2006) ("We must construe the words of the statute in their ordinary, everyday sense."); *accord Chickasaw Nation v. United States*, 208 F.3d 871, 876 (10th Cir. 2000); *see* Scalia & Garner, *supra*, at 69 ("Words are to be understood in their ordinary, everyday meanings—unless the context indicates that they bear a technical sense." (emphasis omitted)). And applying the ordinary and everyday meaning of the word "other" in clause (vii), it becomes patent that Congress did not intend for that clause to address the "subjects" covered in the preceding clauses of subsection (C)—including the jurisdictional-allocation subject of clause (ii). *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1598 (1961) [hereinafter "WEBSTER'S"] (defining "other" to mean, *inter alia*, "being the ones distinct from the one or those first mentioned" and "not the same: Different"); THE AMERICAN HERITAGE DICTIONARY 880 (2d ed. 1982) [hereinafter "AMERICAN HERITAGE"] (defining "other" to mean, *inter alia*, "[d]ifferent from that or those implied or specified"); *see also* THE NEW OXFORD AMERICAN DICTIONARY 1205 (2d ed. 2005) [hereinafter "NEW OXFORD"] (noting that the word "other" is "used to refer to a person or thing that is different from one already mentioned or known about" and further defining it, *inter alia*, to mean "those remaining in a group; those not

---

⁹(...continued)
*States v. Husted*, 545 F.3d 1240, 1243–44 (10th Cir. 2008).

32

already mentioned"); *cf. Wis. Cent. Ltd. v. United States*, --- U.S.. ----, 138 S. Ct. 2067, 2071(2018) ("As usual, our job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)) (then citing contemporary dictionaries to determine meaning of the disputed statutory term)).

Nor could one persuasively argue that the term "other" in clause (vii) authorizes the allocation of jurisdiction with respect to subjects *other than* those covered by the jurisdictional-allocation language of clause (ii). In our view, a well-established canon of statutory construction—the negative-implication canon (i.e., the canon *expressio unius est exclusio alterius*) would fatally undercut such an argument. That canon provides that the "expressi[on] [of] one item of [an] associated group or series excludes another left unmentioned." *N.L.R.B. v. SW Gen., Inc.*, --- U.S. ----, 137 S. Ct. 929, 940 (2017) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002)). In other words,"[t]he notion is one of negative implication: the enumeration of certain things in a statute suggests that the legislature had no intent of including things not listed or embraced." *Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1034 & n.24 (10th Cir. 2003) (quoting William N. Eskridge, et al., CASES AND MATERIALS ON LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 947 (3d ed. 2001))) *see also* Scalia & Gardner, *supra*, at 107 (discussing the operation of the "negative-implication canon").

33

Here, clause (ii) is the only clause in subsection (C) that expressly addresses the allocation of jurisdiction between states and tribes. And, as our reasoning in Part III.B.1, *supra*, demonstrates, it does so in specific terms—albeit by cross-reference—to clause (i). That is, by its use of the language "such laws and regulations," clause (ii) expressly refers back to the "laws and regulations" of clause (i)—which are "directly related to, and necessary for, the licensing and regulation of" the playing of Class III games, § 2710(d)(3)(C)(i). And it contemplates tribal-state compacting regarding the allocation of criminal and civil jurisdiction "necessary for the enforcement" of the laws and regulations specified in clause (i). § 2710(d)(3)(C)(ii). Thus, the allocation of jurisdiction referenced in clause (ii) pertains solely to the allocation that is "necessary for the enforcement of the laws and regulations," *id.*, that are "directly related to, and necessary for, the licensing and regulation of" the playing of Class III games, § 2710(d)(3)(C)(i)—that is, "what goes on in a casino—[that is,] *each roll of the dice and spin of the wheel*," *Bay Mills*, 134 S. Ct. at 2032 (emphasis added).

Therefore, clause (ii)'s specific textual expression (by cross-reference) of matters covered by its jurisdictional allocation reasonably indicates that Congress did not envision that any distinct subjects—such as tort claims arising from a casino's failure to safely maintain floors in its restrooms—would provide the grounds for a jurisdictional allocation. *See Halverson v. Slater*, 129 F.3d 180, 186 & n.8 (D.C. Cir. 1997) (applying the negative-implication canon to hold that

34

a statute that specifically "delineates the class of permissible delegatees as officers, employees and members of the Coast Guard" was "intended to exclude delegation to non-Coast Guard officials" under another, general delegation statute, even though the former statute "did not *expressly* prohibit delegation of" the "powers and duties [at issue] to a non-Coast Guard official" and did not explicitly use the term "only" in listing the class of delegatees); *see also United States v. Giordano*, 416 U.S. 505, 514 (1974) (tacitly applying the logic of the negative-implication canon in concluding that, though the statute at issue did not use "[e]qually precise language forbidding delegation" as those which delegated duties *only* to certain officials, its language "fairly read, was intended to limit the power to authorize wiretap applications to the Attorney General himself and to any Assistant Attorney General he might designate," and another statute that generally authorized the Attorney General to delegate his or her duties to agency employees did not permit further delegation of the power to authorize wiretap applications); Scalia & Garner, *supra*, at 107 ("The doctrine properly applies only when the *unius* (or technically, *unum*, the thing specified) can reasonably be thought to be an expression of *all* that shares in the grant or prohibition involved."); *id.* at 108 (noting that "[t]he more specific the enumeration, the greater the force of the canon"); *id.* at 111 (discussing *Giordano* in the context of noting that "the negative-implication canon is so intuitive that courts often apply it correctly without calling it by name"). Thus, we do not believe that the term

35

"other" in clause (vii) authorizes the allocation of jurisdiction with respect to subjects *other than* those covered by the jurisdictional-allocation language of clause (ii). *Cf.* Scalia & Garner, *supra*, at 167 ("Context is a primary determinant of meaning. A legal instrument typically contains many interrelated parts that make up the whole. The entirety of the document thus provides context for each of its parts.").

Lastly, our conclusion is independently and distinctly bolstered by our "preference for avoiding surplusage constructions." *King v. Burwell*, --- U.S. ----, 135 S. Ct. 2480, 2483 (2015) (quoting *Lamie v. United States Trustee*, 540 U.S. 526, 536 (2004)); *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (declining to "adopt respondent's construction of the statute" because it would render a word in the statute "insignificant, if not wholly superfluous"). More specifically, "[t]he canon against surplusage indicates that we generally must give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning." *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1283 n.15 (10th Cir. 2017); *see* Scalia & Garner, *supra*, at 174 ("If possible, every word and every provision is to be given effect . . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (emphasis omitted)). Yet, *if* we were to adopt an expansive reading of clause (vii), in which jurisdiction may be allocated for "*any* . . . subjects that are directly related to the

36

operation of gaming activities," § 2710(d)(3)(C)(vii)[10]—including tort claims arising from a casino's failure to safely maintain floors in its restrooms—it would render clause (ii)'s jurisdictional-allocation language mere surplusage.

Put more finely, such a reading would wholly swallow clause (ii)'s specific and narrow allowance for jurisdictional allocations that are "necessary for the enforcement of the laws and regulations," § 2710(d)(3)(C)(ii), that are "directly related to, and necessary for, the licensing and regulation of" the playing of Class III games, § 2710(d)(3)(C)(i). That is because such laws and regulations directly pertaining to, and necessary for, the licensing and regulation of Class III games, and the matters necessary for their enforcement, patently constitute one of the subjects that is "directly related to the operation of gaming activities." § 2710(d)(3)(C)(vii). In this regard, we have no doubt that (given its common, everyday meaning) the term "operation" in this context sweeps broadly. *See* WEBSTER'S, *supra*, at 1581 (defining "operation" to mean, *inter alia*, "method or manner of functioning"); AMERICAN HERITAGE, *supra*, at 871 (defining "operation" to mean, *inter alia*, "[a] process or series of acts performed to effect a certain purpose or result"); *see also* NEW OXFORD, *supra*, at 1193 (defining "operation" to mean, *inter alia*, "an activity in which" a "business or

_____

[10]    This is in effect the reading of clause (vii) that the district court adopted here. As mentioned in note 9, *supra*, the court's reading failed to give effect to, and in fact misguidedly elided, the critical term "other" in clause (vii).

organization; a company" "is involved"); *cf. Chemehuevi Indian Tribe v. Brown*, No. EDCV161347JFWMRWX, 2017 WL 2971864, at *6 (C.D. Cal. Mar. 30, 2017) (unpublished) (noting that "if Congress intended the permissible topics set forth in . . . [clause] (vii) to be more narrowly construed, it would not have utilized the broad language it did"). And, therefore, even with the limiting language "directly," clause (vii) would have the effect of subsuming, and rendering of no effect, the language and substance of clause (ii)—*viz.*, *if* clause (vii) were construed in the expansive manner noted, to include the subject of jurisdictional allocation, it would have this effect.

Put another way, if clause (vii)'s language were read to allow for compacts to allocate jurisdiction with respect to *any* subjects directly related to the *operation* of Class III games, the more specific and limited jurisdictional-allocation language of clause (ii) would be (in substance) duplicative, nugatory, and of no effect—i.e., surplusage. Consequently, we conclude that the statutory-construction canon that counsels courts to avoid interpretations that render statutory terms surplusage is an independent and distinct ground for rejecting the expansive reading of clause (vii) discussed herein. *See Halverson*, 129 F.3d at 185 (rejecting argument that a specific delegation statute does not "provide any delegation authority beyond what [the agency head] already possesses under [a general delegation statute], and thus, at most, merely confirms his . . . authority [under that general delegation statute]" because "[t]his reading plainly violates

38

the familiar doctrine that the Congress cannot be presumed to do a futile thing").

**2**

The Appellees present three counterarguments; none lands with any force. First, Appellees, again citing to the statute's legislative history, contend that the catch-all section (i.e., clause (vii)) should be read broadly, consistent with their understanding of Congress's intent. *See* McNeal Aplees.' Br. at 9–13; J. Dalley's Br. at 16–23. This argument can gain no traction here, however, in light of our conclusion that the statute is unambiguous. Because it is so, we have no need (much less an inclination) to "resort" to the statute's legislative history. *Public Lands Council v. Babbitt*, 167 F.3d 1287, 1306 (10th Cir. 1999) ("Courts should not resort to legislative history in order to ascertain Congress's intent when the plain language of the statute is unambiguous."); *see Edwards v. Valdez*, 789 F.2d 1477, 1481 (10th Cir. 1986) ("When the meaning of the statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent.").

Second, the McNeals rely on the Ninth Circuit's opinion in *In re Indian Gaming Related Cases*, 331 F.3d 1094 (9th Cir. 2003), for the proposition that clause (vii) must be read broadly to provide state residents protection from injury while they are at the casinos. *See* McNeal Aplees.' Br. at 15–16. This argument is unconvincing. First of all, it goes without saying that the Ninth Circuit's construction of IGRA is not binding on us. Furthermore, the Ninth Circuit's

pertinent holding in that case—*viz.*, that labor issues were "directly related to the operation of gaming activities" under clause (vii), *In re Indian Gaming*, 331 F.3d at 1115–16—does not speak to the essential question before us: whether Congress intended clause (vii)'s broad and general language to authorize tribes and states to compact regarding the allocation of jurisdiction over tort claims like the McNeals'. Lastly, insofar as *In re Indian Gaming* informs our resolution of that question, it actually undercuts the McNeals' position. The latter two points would benefit from a little more discussion.

Specifically, in analyzing and ultimately distinguishing *In re Indian Gaming*, we accept, without definitively opining on the matter, the proposition that labor issues fall within the broad scope of clause (vii)'s "operation of gaming activities," even when the term "gaming activities" is viewed through the prism of *Bay Mills*, to mean the actual playing of Class III games. *See Bay Mills*, 134 S. Ct. at 2032 (emphasis added) (defining "gaming activity" as "what goes on in a casino—[that is,] each roll of the dice and spin of the wheel"); Bryan H. Wildenthal, *Federal Labor Law, Indian Sovereignty, and the Canons of Construction*, 86 OR. L. REV. 413, 429–30 (2007) (Noting that many state-tribal compacts "address[ed] the issue of labor relations" pursuant to IGRA and that "it was anticipated by language in IGRA in which Congress—while not expressly referring to labor issues—broadly authorized states and tribes to include compact provisions on 'any . . . subjects that are directly related to the operation of gaming

40

activities'"); *id*. at 430 n.47 ("There may well be grounds to question the use of IGRA to impose labor relations requirements on Indian tribes, though it seems to be a well-established practice.").  But that proposition does not directly offer any insight into the specific question we must decide, regarding whether the subject of jurisdictional allocation over claims (notably, tort slip-and-fall claims) is included within the scope of clause (vii).  More specifically, nothing in *In re Indian Gaming* suggests that clause (vii) permits the allocation of jurisdiction at all; indeed, the McNeals seem to recognize this by failing to make any such argument. *Cf*. COHEN'S HANDBOOK, *supra*, § 12.05[3], at 894 (describing the case as dealing with "revenue-sharing" and "labor relations" disputes, and not discussing any jurisdictional concerns).

Furthermore, to the extent that the inclusion of labor-relations issues within the ambit of clause (vii) offers clues regarding the resolution of the question before us, they do not avail the McNeals.  Specifically, assuming that labor-relations issues "directly relate[] to the operation of gaming activities," § 2710(d)(3)(C)(vii), it does not strike us as remarkable that such issues would fall squarely within the scope of clause (vii) because labor-relations issues are not expressly addressed in any of the preceding clauses of subparagraph (C) and, therefore, would be "other" in relation to the subjects addressed in those preceding clauses.  In other words, labor-relations issues would naturally fall within clause (vii)'s catch-all category of "any *other* subject," *id.* (emphasis

41

added), because that subject is not mentioned in the preceding clauses of subparagraph (C). In contrast, this logic undercuts the notion that the subject of jurisdictional allocation falls within the scope of clause (vii) because this subject *is* expressly addressed in the preceding clauses—specifically, in clause (ii). Therefore, to the extent that *In re Indian Gaming* informs our resolution of the question we must answer here, it actually belies the McNeals' argument.

Third, and lastly, Judge Dalley contends that the reading of § 2710(d)(3)(C) that we now endorse "would invalidate many provisions in this and other gaming compacts that have been negotiated by tribes and states." J. Dalley's Br. at 27. For example, he asserts that key provisions of the tribal-state compact before us—involving "the physical safety of patrons and employees," "wages on construction projects," and "criminal jurisdiction" over offenses committed by non-Indians on Indian land—will all be "invalidate[d]" because they do not "directly relate[] to" "gaming activities," as this statutory language is understood through the lens of *Bay Mills*. *See id.* We find Judge Dalley's argument unpersuasive, however.

First of all, Judge Dalley's brief fails to offer us much by the way of reasoning to explain the basis for his parade of horribles, relying instead on conclusory statements. *See id.* ("None of these provisions is likely sufficiently 'directly related to' 'gaming activities' under the Navajo Nation and Pueblo of Santa Ana's interpretations of the IGRA to survive scrutiny."). Second, at least

42

in the absence of such reasoning, we are hard-pressed to see how the reading of the statutory language "directly related to . . . gaming activities," § 2510(d)(3)(C)(vii); *see also* § 2510(d)(3)(C)(i) ("directly related to . . . such [gaming] activity), that we endorse here could have the widespread destructive effect that Judge Dalley predicts. This language is construed in the context of our limited procedural holding that relates solely to whether IGRA authorizes tribes to *allocate jurisdiction* over tort claims like the McNeals' to state courts. This holding does not address what substantive matters are proper subjects of compacting under IGRA, such as the physical safety of casino staff and visitors, and the proper wage rates on casino projects, much less invalidate compact provisions pertaining to such substantive subjects. As noted, the question before us is a procedural one involving the statutory authorization under IGRA to shift jurisdiction over tort claims like those of the McNeals. Furthermore, even assuming *arguendo* that the Tribe has allocated to New Mexico in the instant compact *criminal* jurisdiction over offenses committed by non-Indians on tribal land, the propriety of this procedural subject is not before us, and we have no obligation nor inclination to opine on the implications of our decision for the vitality of this compact provision.

In all events, our main concern here ultimately must be the faithful and true interpretation of IGRA's plain terms, not the ostensible collateral effects of our interpretation on existing compact provisions; generally, this is true at least so

43

long as our interpretation would not yield absurd results, and it patently would

not do so, nor does Judge Dalley argue to this effect. *See, e.g., Sebelius v. Cloer*,

569 U.S. 369, 381 (2013) ("We reiterate that 'when [a] statute's language is plain,

the sole function of the courts—at least where the disposition required by the text

is not absurd—is to enforce it according to its terms.'" (quoting *Hartford*

*Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, (2000))).

Thus, we reject Judge Dalley's argument as well.

***

In sum, we hold that clause (vii) of IGRA does not authorize tribes to

allocate to states jurisdiction over tort claims like the McNeals', based on our

interpretation of the clause's plain language, in the context of the other clauses of

subparagraph (C) of § 2710(d)(3).

## IV

In light of the above, we conclude that IGRA, under its plain terms, does

not authorize tribes to allocate to states jurisdiction over tort claims like those

brought by the McNeals here.[11]  Stated differently, the Appellees have failed to

---

[11]      One argument that we do not rely upon in coming to this conclusion is the Nation's argument that we should resolve any ambiguity in IGRA in its favor based on the Indian canon of statutory interpretation. *See* Aplt.'s Opening Br. at 10.  As we discussed in note 6, *supra*, this canon provides that "doubtful expressions" in statutes should be "resolved in favor of the Indians," *Bryan*, 426 U.S. at 392 (quoting *Alaska Pac. Fisheries Co.*, 248 U.S. at 89), but it is typically only operative when the statute is ambiguous, *see, e.g., E.E.O.C./Cherokee*, 871

(continued...)

44

clear a threshold hurdle: they have not established that IGRA authorizes the

allocation of jurisdiction to state courts for these tort claims. As such, we

**REVERSE** the district court's judgment and **REMAND** with instructions to grant

the Nation's request for declaratory relief.

---

[11](...continued)
F.2d at 939. As we have underscored, we do not find the IGRA provisions at issue here to be ambiguous; therefore, we eschew reliance on this canon.