FILED
United States Court of Appeals
Tenth Circuit

November 25, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

VOTER REFERENCE FOUNDATION, LLC,

      Plaintiff-Appellee/Cross-Appellant,

v.

RAÙL TORREZ, in his official capacity as New Mexico Attorney General; MAGGIE TOULOUSE OLIVER, in her official capacity as New Mexico Secretary of State,

      Defendants-Appellants/Cross-Appellees.

Nos. 24-2133 and 24-2141

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:22-CV-00222-JB-KK)**

_____

Lawrence M. Marcus, Assistant Solicitor General (Raúl Torrez, New Mexico Attorney General; Seth C. McMillan, Deputy Solicitor General; Alexander W. Tucker, Assistant Solicitor General; and Mark W. Allen, Assistant Attorney General – Deputy Director Government Litigation, State of New Mexico Department of Justice, with him on the briefs), Office of New Mexico Attorney General, Santa Fe, New Mexico, for Defendants-Appellants/Cross-Appellees.

Edward D. Greim (Matthew R. Mueller, with him on the brief), Graves Garrett Greim LLC, Kansas City, Missouri, for Plaintiff-Appellee/Cross-Appellant.

_____

Before **TYMKOVICH**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

_____

**TYMKOVICH**, Circuit Judge.

_____

Voter Reference Foundation obtains and publishes voter data on its website to enhance transparency into the electoral process and encourage voter participation. To do so, VRF requests voter data kept and managed by state agencies on a quarterly basis and repurposes them to share on its website, free of charge. The requested information generally includes the voter's name, address, voter registration, party affiliation, and voting participation history, among other things.

This dispute arose when VRF requested and published voter data received from the New Mexico Secretary of State's Office. In response, the Office referred VRF to the New Mexico Attorney General for criminal investigation and prosecution pursuant to allegations that it violated New Mexico statutes that restrict use and sharing of voter data. The Office thereafter refused to respond to VRF's subsequent voter data requests.

VRF then filed a 42 U.S.C. § 1983 action against the New Mexico Secretary of State and Attorney General (collectively, "the State"), seeking declaratory judgment and preliminary and permanent injunctive relief. It argued New Mexico's restrictions are preempted by, and violate, the National Voter Registration Act. VRF also alleged various First and Fourteenth Amendment claims. The district court granted VRF a preliminary injunction, but we stayed the injunction. The parties then cross-moved for summary judgment. The district court ultimately agreed with VRF's preemption

2

argument and enjoined the State from criminally prosecuting VRF based on any alleged violations of New Mexico's restrictions. The court sided with the State on several of the remaining claims, finding that the restrictions were neither unconstitutionally overbroad or vague under the First Amendment nor motivated by retaliatory animus. But after a one-day bench trial, the court held the State committed viewpoint discrimination under the First Amendment when they refused to provide voter data to VRF.

Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM** the district court's decision that New Mexico's restrictions are preempted by the NVRA and remand the case for further proceedings. We do not reach the court's decisions as to VRF's First Amendment claims.

## I.    Background

### A.    *Factual Background*[1]

#### *1.    The Parties*

Voter Reference Foundation operates a free website, VoteRef.com, to "provide public access to official government data pertaining to elections, including voter registration rolls" in hopes of increasing voter participation and transparency. Op. 5–6. The website's Terms of Service provides, in short, that its services are for "election-related, non-commercial use" and that the information may only be used

---

[1] The parties agreed to the factual background in the district court's opinion resolving the parties' summary judgment, and thus we rely on it also. We provide an abbreviated version of the facts as necessary for this appeal.

accordingly. The information shared on the website varies by state but generally includes a voter's name, birth year, registration address, registration date, party affiliation, registration status, precinct, and voting participation history. This information is obtained through data from state agencies directly or through third-party vendors each quarter.

Defendant Maggie Oliver is the Secretary of State for New Mexico and the State's chief election officer. She is responsible under state law for furnishing voter data to requesters and referring potential violations of New Mexico's Election Code to the Attorney General for investigation and prosecution. Defendant Raùl Torrez is the Attorney General for New Mexico and thus responsible for investigating and prosecuting violations of the Election Code.

###### 2.    *The Dispute*

VRF received New Mexico's voter data[2] from a third party who obtained it from the Secretary of State's Office in April 2021, one month after the third party requested it. At the time, the Office required submission of a Voter Information Authorization form. The form mandated that the voter data be used only for a governmental use, campaign use, or election-related purpose. No other use options were available, and no additional space was provided to elaborate on the requested

---

[2] The voter data consisted of the name, physical address, mailing address, year of birth, party affiliation, precinct assignment, jurisdiction, registrant ID number, associated districts, voting history, and method of voting for each registered voter in the State of New Mexico.

voter data's purpose. The third party indicated the requested voter data would be used for an election-related purpose.

The form also included an attestation that read:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).
>
> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

Op. 11. The third party signed below the attestation, and paid $5,378.12 to the Office for the request. And VRF paid the third party $15,000 for transfer of that same voter data.

Reviewing the voter data, VRF recognized a discrepancy between the number of voters who voted in 2020 and the number of ballots reported in the State's voter history. VRF reached out to the Office about the numerical gap, but did not hear back. That same month, VRF posted New Mexico's voter data on its public website with a press release regarding the discrepancy.[3] The corresponding press release clarified that the discrepancy does not necessarily indicate fraud but that there may

---

[3] The published voter data contained the registered voter's name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history. It did not include any voter's voter ID number, social security number, telephone number, or email address. VRF included a disclaimer that the information is shared as it was provided by the Office, and that any concerns about inaccurate data or inclusion of a voter who is in the Safe At Home program (a confidential address program for domestic violence victims) should be directed to the Office.

be issues with recordkeeping, which should be remedied through enhanced transparency and maintenance of voter data.

Around the same time, a journalist contacted the Office's communications director about VRF's website and its press release. The director responded that the VRF website was "misleading the public" by casting doubt on the 2020 election and "perpetuating misinformation." The director called VRF a "a political operative" that lacks understanding of the process of voter list maintenance. Op. 15–16. He added that VRF's accusations attempt to impugn the integrity of New Mexico's voter data, despite the Office's up-to-date voter list maintenance. The director noted that VRF did not directly request the voter data from the Office, and thus its authenticity and lawful use were questionable. Moreover, the director expressed the Office's belief that VRF violated New Mexico's Election Code by unlawfully posting the state's voter data on its website; he explained that posting "personal voter data on a private website" intending to spread misinformation about the 2020 election does not qualify as an appropriate governmental purpose, election-related, or election-campaign purpose. In short, the Office believed VRF violated the state's "Use Restrictions"[4]

---

[4] The Use Restrictions, or "access ban" according to VRF's amended complaint, refer to New Mexico's Election Code limitation that, under New Mexico law, "[e]ach requester of voter data . . . or special voter lists shall sign an affidavit that the voter data . . . shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." Op. 79–80 (citing N.M. Stat. Ann. § 1-4-5.5(C) (2015) (Requests for voter data, mailing labels or special voter lists)).

and "Data Sharing Ban."[5]  Based on this correspondence, the journalist published an article titled "Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques."[6]  The Office thereafter referred VRF to New Mexico's Attorney General for criminal investigation and prosecution.  The Attorney General's Office forwarded the criminal referral letter to the FBI.

---

[5] The Data Sharing Ban refers to the State's interpretation of New Mexico's Election Code, which mandates that a requester cannot share, disseminate, distribute, publish, or otherwise make available requested voter data to a third party.  Op. 77, 303.  This prohibition of posting voter data online was passed as HB No. 4, N.M. Stat. Ann. § 1-4-5.6(A)(1)–(2) during this litigation.  The relevant section reads:

> A. Unlawful use of voter data, mailing labels or special voter lists consists of:
>
> (1) the knowing and willful selling, loaning, providing access to or otherwise surrendering of voter data, mailing labels or special voter lists by a person for purposes prohibited by the Election Code; or
> (2) causing voter data, mailing labels or special voter lists or any part of the voter data, mailing label or special voter lists that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means.

N.M. Stat. Ann. § 1-4-5.6(A)(1)–(2) (Amended by L. 2023, Ch. 84, H.B. No. 4 § 3, eff. July 1, 2023).

[6] Megan O'Matz, *Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques*, ProPublica (Mar. 7, 2022), https://www.propublica.org/article/voter-ref-foundation (on file).  Secretary Oliver also expressed her views on social media.  She endorsed the published article and posted, for example, that "New Mexico has some of the cleanest voter rolls in the nation" and that any misinformation otherwise is a rumor that "leads people to question the outcomes of our elections."  Bench Trial Op. 20–21.

Two months later, VRF requested additional voter data from the Office—

specifically, it requested data on registered voters who cast a ballot in November

2020 but were subsequently dropped from active status between November 2020 and

April 2021.[7]  The Office did not produce the requested data, despite VRF's follow-up

to its request.  An internal note indicated that the Office was "not fulfilling records

requests from [VRF]" per a contact with the Attorney General's Office.  Op. 30.

The following month, VRF removed the New Mexico voter data from its

website for fear of criminal prosecution.  Simultaneously, VRF filed a complaint for

declaratory judgment and injunctive relief under the First and Fifth Amendments.[8]

While VRF's preliminary injunction motion was pending, VRF sent a letter titled,

"Notice of Violation of National Voter Registration Act & Request for Records," to

Secretary Oliver regarding the Secretary's alleged violation of the NVRA.  VRF

stated the Public Disclosure Provision of the NVRA, which preempts New Mexico's

Election Code, statutorily requires the Secretary to make certain voter data available

for public inspection.  It explained that the Secretary's refusal to produce the

---

[7] The request stated:

> The total count, by county/precinct of any registered voters
> who cast a ballot in the November 3, 2020, [sic] who have
> been subsequently placed in an inactive, canceled[,] deleted,
> removed (or any registration status other than active) or any
> voter that has been removed or deleted from the voter rolls
> between November 3, 2020 and April 13, 2021.

Op. 29.

[8] VRF initially based its claim under the Fifth Amendment; later, it amended
its complaint and based its claim on the Fourteenth Amendment.

requested voter data directly violated the NVRA, and requested that the information

be provided.[9]  The notice clarified that VRF sought to publish the voter data on its

website for election purposes but would only publish the voters' personal information

depending on the litigation's outcome.

This time, the Office responded.  It stated that VRF's voter data request would

require the Office to "conduct research, aggregate data from multiple sources," and

generate a new report because it is not a record that the Office already holds.  Op. 38.

In turn, the Office reasoned that it was not violating the NVRA because it is not

compelled to create new records.[10]  And as to VRF's voter-data request for all current

voter-resignation data, the Office posited that it is "prudent to delay production of

---

[9] VRF requested the following voter data:

> 1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

> 2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active. [sic]

Op. 35.  The notice included Voter Information Authorization forms filled out by VRF, which indicated that the voter data will be used for election-related purposes.

[10] The Office uses the State Elections Registration & Voting Integrity System (SERVIS) database, which can generate reports detailing various requests for voter data.  Some reports can be generated automatically, while others can take up to multiple weeks to fulfill.  Either way, every voter-data report must be created to accommodate the requested data.

th[e] data" because it believes publishing New Mexico voter data on a website violates the state's Election Code, regardless of VRF's position that it would not publish any data without a court's approval. The Office indicated that it would only fulfill VRF's request based on the outcome of the federal litigation and related appeal. The New Mexico Attorney General also advised the Office to deny the requests.

### B.    *Procedural Background*

VRF's initial complaint raised five counts against the State for violating the First and Fifth Amendments. As noted above, VRF filed its complaint and moved for preliminary injunction to enjoin the State from prosecuting VRF under New Mexico's Election Code and restricting VRF's use and publication of voter data.

The district court granted VRF's motion, holding that publication of voter data on its website qualified as a governmental or election purpose. Relying on that decision, VRF republished the New Mexico voter data on its website.[11] On appeal, we stayed the preliminary injunction, prompting VRF to again remove the New Mexico voter data from its website.

---

[11] VRF renewed its request to the Office for voter data and continued to make voter-data requests throughout this litigation. The Office responded that it will not produce the data for various reasons, including that the Office believes VRF has and will violate the law by publishing the voter data on its website. The Office stated that as to data production, it will comply with court orders accordingly. And as promised, the Office produced some voter data, including individual, identifiable voter data, almost a year later after the court held a hearing for the parties' summary judgment motions. The parties represented at oral argument that all of VRF's requests have since been fulfilled.

VRF thereafter amended its complaint to allege the following claims: (1) preemption of the Use Restrictions and Data Sharing Ban by the NVRA; (2) the Use Restrictions violate the NVRA; (3) the Use Restrictions and the threat of criminal prosecution constitute First Amendment retaliation; (4) the Use Restrictions and the threat of criminal prosecution constitute prior restraint under the First Amendment; (5) the Use Restrictions and the threat of criminal prosecution constitute a ban on core political speech in violation of the First Amendment; (6) the Data Sharing Ban is overbroad for First Amendment purposes; and (7) the Data Sharing Ban is void for vagueness under the First and Fourteenth Amendments. VRF also requested declaratory judgment.

The parties cross-moved for summary judgment, and the court made the following rulings:

- Granted VRF's motion in part, finding that: (1) the NVRA preempts the Use Restrictions and Data Sharing Ban; (2) the NVRA mandates the disclosure of the requested state voter data; and (3) VRF may not be subject to state criminal prosecution for violation of the Use Restrictions and Data Sharing Ban based on its posting of New Mexico voter data.

- Granted the State's motion in part, finding that: (1) the Use Restrictions and Data Sharing Ban are not unconstitutionally overbroad or vague under the First Amendment; and (2) VRF could not show retaliation under the First Amendment.

- The court determined that material issues of fact existed as to whether the State subjected VRF to viewpoint discrimination under the First Amendment.

Following a one-day bench trial, the district court found that the State's decision not to provide voter data to VRF was viewpoint discrimination in violation

11

of the First Amendment. The court thus enjoined the State from engaging in future viewpoint discrimination and enforcing the Use Restrictions and Data Sharing Ban against VRF.

## II.   Discussion

There are several issues on appeal, which we tackle one at a time. And in doing so, we conclude that our affirmance of the district court's findings as to preemption necessarily means we need not reach the First Amendment issues.

### A.   Standing

Standing was not an issue in the appealed summary judgment motions or bench trial findings, nor was it briefed in either of the parties' respective opening briefs. But before oral argument, the State filed supplemental authority to highlight two decisions from other circuits to argue that VRF does not have standing because it cannot overcome the injury-in-fact requirement.

Standing is a prerequisite to a federal court's subject matter jurisdiction, and thus "any party, including the court sua sponte, can raise the issue of standing for the first time at any stage of the litigation, including on appeal." *New England Health Care Emps. Pension Fund v. Woodruff*, 512 F.3d 1283, 1288 (10th Cir. 2008) (citing *Rector v. City and County of Denver*, 348 F.3d 935, 942 (10th Cir. 2003)). We review questions of standing de novo. *Id.* (citation omitted).

To demonstrate standing, a plaintiff must show an injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury must be concrete and particularized, and not hypothetical. *New England Health*

*Care*, 512 F.3d at 1288.  In certain circumstances, a plaintiff may satisfy standing by demonstrating a credible threat of future prosecution.  *Scott v. Allen*, No. 24-1349, 2025 WL 2525296, at *5 (10th Cir. Sept. 3, 2025).  "To prove injury in fact for purposes of pre-enforcement standing, a plaintiff must show 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'"  *Id.* (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).  For example, a statute's chilling effect on one's exercise of his First Amendment rights may be a cognizable injury in fact.  *See id.*  To show that a chilling effect is sufficiently concrete and particularized, a plaintiff may produce:

> (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

*Id.* (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006)).

The State relies on cases from other circuits that dismissed NVRA claims for lack of jurisdiction.  In those cases, plaintiffs had not alleged an injury in fact because they could not show that the unlawful denial of record requests caused a concrete downstream injury.  *See Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.*, 136 F.4th 456, 465–69 (3d Cir. 2025) (finding no standing because the organization only suffered informational injury *without a concrete harm*; i.e.,

13

"adverse downstream consequence for its mission or future plans that has a nexus to the interest Congress sought to protect in enacting the NVRA"); *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 629 (6th Cir. 2025) ("A plaintiff may allege an informational injury, but it must identify concrete downstream consequences from failing to receive the required information." (citation modified)).

But VRF's claim does not rest on an informational injury; it rests on the statute's chilling effect. VRF faces possible criminal investigation and prosecution based on the Secretary's criminal referral letter to the Attorney General and FBI, indicating that VRF's conduct is proscribed by New Mexico's Election Code. Secretary Oliver nor the Office has seemingly withdrawn its criminal referral of VRF, and the Attorney General similarly appears to continue to assert his right to investigate and prosecute VRF. *See* Bench Trial Op. 68 n.33.

This credible threat of prosecution has chilled VRF from exercising its First Amendment right to publish voter data on its website for free. Throughout this litigation, VRF has expressed that it wishes to engage in such speech to further its organizational purpose; but the fear of criminal investigation and prosecution forced VRF to remove the New Mexico voter data from its website. We find these circumstances sufficiently establish VRF's standing—the undisputed facts show that there is a concrete injury in fact "caused" by the State's willingness to prosecute VRF, which can be redressed by a favorable decision.

Moreover, the NVRA provides a private right of action that allows declaratory or injunctive relief for those who are harmed by a violation of the statute:

14

(1) A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

(2) If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a *civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation*.

52 U.S.C. § 20510(b) (emphasis added). Here, VRF sent a written notice to Secretary Oliver once it believed she was violating the NVRA by refusing to make certain voter data available to VRF. And although the Secretary responded, she did not correct the violation within the allotted time. It follows that VRF is well within its statutory right to bring a civil action for declaratory and injunctive relief with respect to the alleged NVRA violation.

In sum, we find VRF has Article III standing to pursue its claims in federal court. Jurisdiction is proper before us.

### B.    Preemption

VRF asserts that the Use Restrictions and Data Sharing Ban are preempted by the NVRA. The district court agreed, finding that the NVRA's Public Disclosure Provision preempts New Mexico's interpretation of its Election Code; but it did not decide whether the NVRA preempts the statutes on which this interpretation relies. Pending this appeal, however, New Mexico codified the Data Sharing Ban. *See supra* note 5. The Use Restrictions and the Data Sharing Ban, therefore, both exist not just as interpretations of New Mexico's election laws, but now as codified

15

statutes. But because the Data Sharing Ban is substantively the same

pre-codification, our analysis and review of the court's findings do not change. For

the reasons stated below, we too find the Use Restrictions and Data Sharing Ban are

preempted under conflict preemption by the NVRA.

### 1.    The NVRA

In 1993, Congress passed the National Voter Registration Act, 52 U.S.C.

§§ 20501–20511, to address "a backdrop of lackluster voter registration and political

participation." *Fish v. Kobach*, 840 F.3d 710, 720 (10th Cir. 2016). The statute aims

at regulating uniform voting laws and procedures because "discriminatory and unfair

registration laws and procedures can have a direct and damaging effect on voter

participation in elections for Federal office and disproportionately harm voter

participation by various groups, including racial minorities." § 20501(a)(3).

The NVRA has four enumerated purposes:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
>
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
>
> (3) to protect the integrity of the electoral process; and
>
> (4) to ensure that accurate and current voter registration rolls are maintained.

§ 20501(b). To achieve these purposes, the NVRA's Public Disclosure Provision

requires States to make certain records related to their list-maintenance activities

publicly available:

(1) Each State shall maintain for at least 2 years and *shall make available for public inspection* and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

§ 20507(i) (emphases added).

### 2. Conflict Preemption

Three types of preemption are recognized—express, field, and conflict. Express preemption "occurs when the language of the federal statute reveals an express congressional intent to preempt state law." *US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010).

Field preemption "occurs when the federal scheme of regulation is so pervasive that Congress must have intended to leave no room for a State to supplement it." *Id.*

And finally, conflict preemption occurs "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives

17

of Congress." *In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 619 F.3d 1188,

1196 (10th Cir. 2010) (citations omitted).  Conflict preemption is at play here.

Conflict preemption "turns on the identification of actual conflict," rather than

"an express statement of preemptive intent." *Geier v. Am. Honda Motor Co.*, 529

U.S. 861, 884 (2000) (citation modified).  Relatedly,

> the Elections Clause[12] requires that we straightforwardly and naturally read the federal and state provisions in question as though part of a unitary system of federal election regulation but with federal law prevailing over state law where conflicts arise.  We do not finely parse the federal statute for gaps or silences into which state regulation might fit.  We refrain from doing so because were states able to build on or fill gaps or silences in federal election statutes[,] . . . they could fundamentally alter the structure and effect of those statutes.  If Congress intended to permit states to so alter or modify federal election statutes, like the NVRA, it would have so indicated. The Elections Clause does not require Congress to expressly foreclose such modifications by the states.

*Fish*, 840 F.3d at 729; *Arizona*, 570 U.S. at 14 ("Because the power the Elections

Clause confers is none other than the power to pre-empt, the reasonable assumption

---

[12]  The Elections Clause, art. IV, cl. 1, provides:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators.

To paraphrase, the Elections Clause has two functions: "Upon the States it imposes the duty ('shall be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; [and] upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013).

is that the statutory text accurately communicates the scope of Congress's pre-emptive intent.").

"What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (citation omitted)

### 3.    Analysis

As both the Supreme Court and this Circuit have indicated, there is no presumption against preemption in the Elections Clause and in NVRA jurisprudence. *Fish*, 840 F.3d at 731–32. We thus "examine the plain meaning of the NVRA and apply the canons of construction as we ordinarily would to determine," *id.* at 732, whether the Use Restrictions and the Data Sharing Ban—as defined and interpreted by the State via New Mexico's election laws—are preempted by the NVRA. We find that they are.

To begin, the NVRA expressly sets forth its purposes: The NVRA seeks to increase the number of registered voters by establishing certain procedures, protect the integrity of the electoral process, and maintain accurate and up-to-date voter registration rolls. *See* § 20501(b). And consistent with those purposes, the NVRA's

19

Public Disclosure Provision requires[13] States to both "maintain" and "make available for *public inspection* . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1) (emphasis added).

To understand this provision, we adhere to a "fundamental canon of statutory construction" and consider the original meaning of the terms at the time Congress enacted the statute—here, that year is 1993. *See New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (quoting *Wisc. Central Ltd. v. United States*, 585 U.S. 274, 277 (2018)). The Eleventh Circuit has already examined the meaning of "public inspection" as utilized in the Public Disclosure Provision, which we also adopt: "To 'inspect' is to 'look carefully into' or to 'view closely and critically.'" *Greater Birmingham Ministries v. Secretary of State for Alabama*, 105 F.4th 1324, 1332 (11th Cir. 2024) (citing *Inspect*, Oxford English Dictionary (2d ed. 1989)). And "[t]o make something available for 'public' inspection, then, is to make it available in public, or to the public, for close scrutiny." *Id.*

These two sections of the NVRA, and the NVRA as a whole, make evident Congress's intent to support the transparency and circulation of voter data among the public to help detect and correct errors. *See Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 54 (1st Cir. 2024) (noting that Congress seemingly believes "that public

---

[13] "Absent a convincing argument to the contrary, 'may' should be 'construed as permissive and to vest discretionary power,' while 'shall' should be construed as 'mandatory.'" *Fish*, 840 F.3d at 733 (citation modified). That is how we interpret "shall" as used in the Public Disclosure Provision.

inspection, and thus public release, of [voter] data is necessary to accomplish the objectives behind the NVRA"). That intent is further evidenced by the private right of action that members of the public have under the NVRA to enforce violations of the statute, including the Public Disclosure Provision. *See* § 20510(b). In other words, critical scrutiny and public audits of voter data were envisioned by Congress in passing the NVRA.

We next turn to the Use Restrictions. The Use Restrictions require voter data or special voter lists provided by New Mexico to be used for "governmental or election and election campaign purposes only" and must "not be made available or used for unlawful purposes." N.M. Stat. Ann. § 1-4-5.5(C). The statute provides definitions for the terms used. "'Special voter list' means a prepared list of selected voters arranged in the order in which requested," while "voter data" refers to "selected information derived from the voter file." *Id.* § 1-4-5.5(E). As to the scope of the listed purposes, "election campaign purposes" is defined as "relating in any way to a campaign in an election conducted by a federal, state or local government," and "governmental purposes" is defined as "noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government." *Id.*

We agree with the district court that the NVRA preempts the Use Restrictions by conflict preemption. The Use Restrictions's limitation of voter-data use to only governmental, election, or election-campaign purposes may seem harmless at first— but the State relies on this restriction to ban internet publication of New Mexico's

21

voter data. And that is how VFR seeks to *use* the data—by publication on its website. So by prohibiting certain uses of New Mexico's voter data, the Use Restrictions obstruct the NVRA's primary goal of providing broad transparency and circulation of such voter data. Put simply, making voter data unavailable for close public scrutiny disrupts the purpose and intended effects of the NVRA. *See Crosby*, 530 U.S. at 373; *see also Bellows*, 92 F.4th at 54 ("[T]he analysis and subsequent dissemination of Voter File data to the public is necessary if members of the public, or organizations such as [the Public Interest Legal Foundation], are ever to identify, address, and fix irregularities in States' voter rolls by exercising their private right of action under the NVRA.").

Resisting this conclusion, the State makes several arguments we find unpersuasive. First, it argues that the Public Inspection Provision only requires States to provide *access* to the requested voter data—they assert the plain language of the provision does not prevent the State from placing reasonable restrictions on how that voter data is *used*. Aplt. Br. 21. The provision indeed requires States to "make available" the respective records, a term that may readily be understood as "access." *See* § 20507(i)(1). But the Use Restrictions, which the State tries to depict as a "reasonable restriction," prohibit comprehensive public disclosure of voter data against the NVRA—that is enough to trigger conflict preemption. Moreover, this interpretation suggests that the State would confine our preemption analysis to express preemption only. But we find *conflict* preemption here, which occurs when a state law or interpretation stands as an obstacle to fulfilling the purposes and

22

objectives set by Congress through a statute like the NVRA. *Geier*, 529 U.S. at 884.

And here, the Use Restrictions functionally frustrate the NVRA's goals.

The State also asserts that the Use Restrictions further other, more important

goals set by Congress. For example, they contend that the Use Restrictions

encourage voter registration by protecting an individual's privacy, which they deem

is a higher priority than detecting voter fraud.[14] The argument fails. First, Congress

did not rank the importance of the enumerated purposes in the NVRA in that way.

Second, it is not the judiciary's job to engage in policy questions; that is the job of

the legislative and executive branches. In fact, Congress acknowledged the question

of balancing transparency and voter privacy by enacting the Public Disclosure

Provision, "which plainly requires disclosure of completed voter registration

applications." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339–40

(4th Cir. 2012) ("Public disclosure promotes transparency in the voting process, and

courts should be loath to reject a legislative effort so germane to the integrity of

---

[14] To the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation. *See* N.M. Stat. Ann. § 1-4-5.5(B) ("In furnishing voter data, . . . the . . . secretary of state shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters."). The State may limit such sensitive information, but as we underscore, restricting uses and/or publication altogether is prohibited by the NVRA. *See Bellows*, 92 F.4th at 56 (citations omitted) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File.").

federal elections.").[15]  And finally, we are required to consider the text of the NVRA in full.  *See* Antonin Scalia & Brian A. Garner, *Reading Law* 167–69 (2012) (Whole-Text Canon).  So "even if the [Use Restrictions may] further the NVRA's objective of enhancing the participation of eligible citizens as voters, it nonetheless creates an obstacle to the accomplishment and execution of the *full* purposes and objectives of Congress as stated in 52 U.S.C. § 20501(b)(1)–(4)." *Bellows*, 92 F.4th at 55.

Lastly, the State appears to cabin the Public Disclosure Provision to mean only *it*, and not third parties like VRF, may exclusively provide access to voter data.  But nowhere does the NVRA require only state-to-party disclosures.  To the contrary, the statute encourages broad and extensive public disclosure of relevant records without restrictions on *who* provides it.  That makes sense because the consequent goal in widely circulating the voter data is so that any inaccuracies can be identified and corrected.

The same preemption analysis applies to the Data Sharing Ban.  The Data Sharing Ban prohibits a requester from unlawfully using voter data against New Mexico's Election Code (i.e., Use Restrictions), such as "knowing and willful selling,

---

[15] The Fourth Circuit similarly addressed the balance between transparency and voter privacy in considering the NVRA's goals.  It held that although the privacy concerns are not unfounded, the "potential shortcoming must be balanced against the many benefits of public disclosure" especially because "disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Long*, 682 F.3d at 339 ("Without such transparency, public confidence in the essential workings of democracy will suffer.").

loaning, *providing access* to or otherwise surrendering" such voter data. *See* N.M. Stat. Ann. § 1-4-5.6(A)(1) (emphasis added). The provision also forbids voter data "to be *made publicly available* on the internet or through other means" if it "could be used to identify, a specific voter or the voter's name, mailing or residence address." *Id.* § 1-4-5.6(A)(2) (emphasis added).

Again, the Data Sharing Ban counteracts and severely burdens the NVRA's enumerated purposes of public inspection and circulation of voter data by restricting the types of voter data that can be made publicly available and accessible. And as we noted, Congress did not limit the role of "providing access" to voter data solely to the individual States. So while there may be avenues in which New Mexico may restrict selling or loaning data without disrupting the purposes of the NVRA, it is a step too far to prohibit public access altogether.

In sum, we agree with the district court. Because the Use Restrictions and Data Restriction Ban "stand[] as . . . obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress" as set out in the NVRA, *In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 619 F.3d at 1196, they are preempted.

### C.    NVRA Violation

VRF next alleges that the Use Restrictions violate the NVRA, and in turn, that the State violated the NVRA by refusing to produce the requested voter data. The

25

district court agreed and granted summary judgment for VRF.[16]  The State maintains

that it did not produce the requested data because VRF was going to publish it on its

website in violation of New Mexico's Election Code.  Given our preemption analysis,

this argument has no merit.  Alternatively, the State asserts that VRF's voter data

requests, *see supra* notes 7, 9, and 11, do not fall within the scope of the NVRA's

Public Inspection Provision and thus it was not required to disclose them to VRF.

Specifically, the dispute centers around the federal statute's definition of "record."

Recall that the Public Disclosure Provision requires every State to "maintain

for at least 2 years and shall make available for public inspection and, where

available, photocopying at a reasonable cost, all *records* concerning the

implementation of programs and activities conducted for the purpose of ensuring the

accuracy and currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1)

(emphasis added).  In disputing the scope of the term, "record," the parties focus their

arguments not on whether the requested voter data in fact concerns the

implementation of relevant program and activities[17] but on whether "record" includes

---

[16] Although the parties conceded at oral argument that the State has now fully
produced all requested voter data, the issue is not moot.  VRF has sought additional
relief, including attorneys' fees, litigation expenses, and costs accrued in its
prosecution of claims made under the NVRA.  *See Dahlem ex rel. Dahlem v. Bd. of
Educ. of Denver Pub. Sch.*, 901 F.2d 1508, 1511 (10th Cir. 1990) (citations omitted).

[17] The State briefly dedicates a paragraph in its response and reply brief that
the "names and addresses" of voters is "personal data" and thus irrelevant to the
respective programs and activities as defined in the statute.  Aplt. Response and
Reply 21–22.  We do not address this belated and haphazardly raised argument.
*Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir.2007) ("[W]e routinely have

dynamic, electronic documents and whether they encompass data that is allegedly "newly created." We consider those arguments in turn.

*First*, the State argues the requested voter data does not fall within the definition of "record" as used in the NVRA. It asserts that "record" as used in the Public Disclosure Provision is a "term of art used by archivists" to mean physical documents. Aplt. Br. 30. For one, the State argues its voter data, which is held electronically, is a "dynamic document." Aplt. Br. 30. It maintains that the NVRA does not apply because a constantly changing database does not need preservation. And because the statute provides that the records must be "photocopied" if available, the State asserts that these records must pertain only to physical documents rather than those kept in an electronic database.

The term "records" is undefined in the NVRA, so we turn to its plain meaning. That is because "[i]t is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation modified); *see also* Scalia & Garner, *Reading Law* 69 ("Words are to be understood in their ordinary, everyday meanings—*unless the context indicates they bear a technical sense*." (emphasis added)). We decline the State's invitation to consider the term to be a "term of art" because there is no indication in the NVRA that the statute

---

declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.").

is directed at archivists, nor does the context of the NVRA signal such an interpretation.

So interpreting the term's ordinary meaning at the time Congress enacted the NVRA, *New Prime Inc.*, 586 U.S. at 113, a "record" is "knowledge or information preserved or handed down" "by being put into writing." *Records*, Oxford English Dictionary (2d ed. 1989). And "writing" is defined as "[t]hat which is in a written (now also typewritten) state or form" or "something penned or recorded." *Writing*, Oxford English Dictionary (2d ed. 1989). Significantly, as far back as 1946, "writing" was understood to include recording information on a computer storage medium. *Id.* ("To enter (an item of data) *in*, *into*, *on*, or *to* a storage medium" such as "computers"). Thus, we interpret "records" to mean knowledge or information that is preserved by being put into written form—whether penned or not. The statute does not require that "records" be put into a physical document; rather, it must only be put into some written form. Put simply, the statute does not limit the records to be in only physical, written forms. Nor does the statute restrict these records from being "recorded" on a medium like on a computer or an electronic database. *See Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 426 (2018) ("The statute says what it says—or perhaps better put here, does not say what it does not say."). And relatedly, there is no showing why the Office cannot physically print these electronically kept records.

As to the State's argument that "dynamic documents" held electronically cannot be records, the argument fails because such an interpretation is counter to the

28

NVRA and its purposes. The Public Disclosure Provision directs States to "maintain" the aforementioned records for at least two years. To "maintain" is to "carry on" or "keep up." *Maintain*, Oxford English Dictionary (2d ed. 1989). Inevitably, this means the records must be consistently and constantly updated—i.e., be dynamic—to "ensure that accurate and current voter registration rolls are maintained." § 20501(b). Moreover, the statute provides that photocopying of the records may be provided for public inspection *where available*. § 20507(i)(1). In other words, Congress understood that photocopying may not be obtainable or feasible in all circumstances, nor is it required, perhaps because the record is not in physical form but kept electronically.

*Second*, the State asserts that the Secretary does not already maintain the requested voter data that VRF seeks and thus she is not obligated to produce such records that must be newly created. Aplt. Br. 30, 35–36. But the Office uses the SERVIS database to maintain and store its voter data for this very purpose. *See supra* note 10. When voter data is requested, the report must be extracted from SERVIS. Depending on the requested data, some reports may take several weeks to fulfill. But as the district court noted, and the State does not dispute, no voter-data report exists before it is generated for specific data. Op. 50. In essence then, every report is and must be necessarily "created" to adhere to the requestor's submission.

The Eleventh Circuit has dismissed a similar argument. In *Greater Birmingham Ministries v. Secretary of State for Alabama*, a religious organization alleged that the Alabama Secretary of State violated the Public Disclosure Provision

29

of the NVRA by failing to provide certain requested voter data records. 105 F.4th 1324 (11th Cir. 2024). There, the Secretary argued that "producing a customized list of records would require him to create *new* records" and "would go beyond the statute's requirement for States to 'maintain' and 'make available' *existing* records." *Id.* at 1331. We agree with the Eleventh Circuit that the argument is groundless:

> Just as "physically searching through and locating data within documents in a filing cabinet" does not fill the cabinet with new documents, "using a query to search for and extract a particular arrangement or subset of data already maintained in an agency's database does not amount to the creation of a new record." *Ctr. for Investigative Reporting v. U.S. DOJ*, 14 F.4th 916, 938 (9th Cir. 2021). Ruling otherwise would defeat the logic of a vast number of public disclosure laws premised on the ability of a requestor to receive a subset of the records a governmental entity holds. *See, e.g.*, 5 U.S.C. § 552(a)(3)(A), (C).

*Id.*

*Third*, and relatedly, the State argues that it is not obligated to produce the voter data electronically. *See* Aplt. Br. 31, 34–35; Aplt. Response & Reply 17, 20–21. They reason that at the time of enactment in 1993, records were largely created in paper form.

To begin, the district court never required Secretary Oliver or the Office to produce the records electronically. Nor does the statute require a specific production format. In *Greater Birmingham Ministries*, the Eleventh Circuit also made clear that the NVRA does not mandate electronic disclosure of voter data. 105 F.4th at 1333–34. So, too, Secretary Oliver could have provided the voter data electronically or physically in photocopied or printed form.

30

The State takes a step further and argues that VRF could have visited—but never did visit—the Office to inspect and photocopy the voter data in person. Aplt. Response & Reply 23. But the Office or the Secretary never instructed VRF to visit the Office to inspect the records, and there is no such requirement under New Mexico law. Rather, the Office only requires that requestors submit the signed Voter Information Authorization form and the associated fee. And the Office responded that it did not plan to produce the requested voter data for two reasons: it is a record that must be newly created, and VRF plans to use the data for improper reasons. The Office did not represent that it could only provide the records physically. And so, the State's belated attempt to put the onus on VRF fails.

*Fourth*, the State argues that names and addresses of all registered voters do not need to be produced to fulfill VRF's voter-data request. Aplt. Br. 32–34. It reasons that "names and addresses" are mentioned only in § 20507(i)(2) and not in subsection (i)(1), which requires that States maintain the aforementioned records. To support that argument, the State invokes a canon of statutory interpretation, *expressio unius est exclusio alterius*—defined as "expressing one item of an associated group or series excludes another left unmentioned." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (citation modified). The State argues that because "names and addresses" are mentioned in subpart (i)(2) but not in (i)(1), the Secretary does not have to include names and addresses in providing the requested voter data.

But such a reading is contrary to the statute's plain meaning. Subsection (i)(2) provides:

31

The *records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2)* are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

§ 20507(i)(2) (emphasis added). The referenced subsection, § 20507(d)(2),[18] refers

to the process of removing names from voting rolls due to a change of address. So

---

[18] § 20507(d), titled "Removal of names from voting rolls," provides:

(1) A State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant—
(A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
(B) (i) has failed to respond to a notice described in paragraph (2); and
(ii) has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.
(2) A notice is described in this paragraph if it is a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:
(A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than the time provided for mail registration under subsection (a)(1)(B). If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of

32

first, we must understand that the "names and addresses of all persons" are linked to those that subsection (d)(2) applies—it does not refer to the names and addresses of every single voter.

Next, subsection (i)(1) provides that "all [relevant] records" must be maintained for public inspection. It does not otherwise exclude names and addresses from these records. That is critical, given that Congress could have provided certain exceptions to the types of records States must keep. Indeed, Congress explicitly provided in subsection (i)(1) that all relevant records must be kept "*except* to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." § 20507(i)(1) (emphasis added). And under *expressio unius est exclusio alterius*, "[t]he notion is one of negative implication: the enumeration of certain things in a statute suggests that the legislature had no intent of including things not listed or embraced." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1213 (10th Cir. 2018) (citation omitted). So the State's attempts at invoking *expressio unius est exclusio alterius* to argue that it does not have to provide names and addresses in the requested voter data is misplaced and incorrect.

_____

the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.
(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

33

Additionally, "include" as provided in subsection (i)(2) means "to contain as a member of an aggregate, or constituent part of a whole; to embrace as a sub-division or section." *Include*, Oxford English Dictionary (2d ed. 1989). And as we previously noted, we read "shall" to mean "require." *See supra* note 12. Here, the State seemingly asks us to implausibly understand "include" as used in subsection (i)(2) to mean "exclude" in (i)(1). Again, we decline the invitation. "[I]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *United States v. Burkholder*, 816 F.3d 607, 615, n.6 (10th Cir. 2016) (citing *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). Thus we understand subsection (i)(1) to require States to maintain all relevant records for two years for public inspection, and for subsection (i)(2) to command States to *include* as part of those records, "names and addresses of all persons to whom notices" were sent under subsection (d)(2), as well as information on whether the person responded to the notice. Such an interpretation adheres to our "preference for avoiding surplusage constructions." *Navajo Nation*, 896 F.3d at 1215 ("The canon against surplusage indicates that we generally must give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning." (citation omitted)).

The First Circuit dealt with a nearly identical argument. *Bellows*, 92 F.4th at 48. There, the Secretary of State argued that subsection (i)(2) necessarily limits the reach of subsection (i)(1) because Congress seemingly provided that personally

34

identifying information of voters is required only for a subset of individuals. *Id.* The First Circuit disagreed, recognizing that subsection (i)(2) "does not make use of the word 'only,'" and similarly emphasized the use of the term, "include." *Id.* And because "the term 'shall include' is by no means exhaustive," it concluded that subsection (i)(2) "is further evidence that [subsection] (i)(1) extends to personal information such as that contained in the [requested voter data]." *Id.* (citations omitted). Moreover, the First Circuit applied the principle of *expressio unius est exclusio alterius* to explain that Congress only carved out two exceptions to subsection (i)(1) and thus the court may not imply additional exceptions where they do not exist. *Id.* 48–49. We find these findings similarly apt here.

We therefore agree with the district court that the Use Restrictions violate the NVRA. By refusing to produce VRF's requested voter data per the Use Restrictions, we find that the State violated the NVRA.

### D.    *First Amendment Claims*

At oral argument, the parties conceded and indicated that we need not reach the First Amendment claims if we affirm the VRF's preemption claim because it would render the remaining claims moot. Accordingly, we decline to address the remaining First Amendment claims in this appeal.

## III.   Conclusion

For the foregoing reasons, we affirm the district court's holding that the NVRA preempts the Use Restrictions and the Data Sharing Ban. We remand the case for further proceedings. We do not reach the First Amendment issues.

35